IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 8:24CR-124 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **STATEMENT OF** |
| vs. | ) | **DEFENDANT PURSUANT TO** |
| | ) | **NECrimR.32.1(B)(6)(c) REGARDING** |
| AARON T. LUNEKE, | ) | **SENTENCING PROCEDURES** |
| | ) | |
| Defendant. | ) | |

COMES NOW the Defendant, Aaron T. Luneke, by and through undersigned counsel, Stuart J. Dornan, and hereby objects to Paragraphs 44, 45, 46, 47, 48, 51, 56, 57, 59, 60, 61, 62, 63, and 65 of the Revised Pre-Sentence Investigation Report, dated April 17, 2026. Said paragraphs all pertain to the calculation of Defendant's Total Offense Level.

## I.    LAW

"Under the guidelines, the district court is to 'make a reasonable estimate of the loss' by considering 'the greater of actual loss or intended loss.' *United States v. Sesay*, 937 F.3d 1146, 1153 (8th Cir. 2019) (quoting U.S. Sent'g Guidelines Manual § 2B1.1 cmt. n.3(A), (C) (U.S. Sent'g Comm'n 2018)). "Intended loss is 'the pecuniary harm that the defendant purposely sought to inflict," *Id.* " Intended loss includes actual loss suffered. *See United States v. Ware*, 334 F. App'x 49, 50 (8th Cir. 2009) (per curiam); "When calculating intended loss, the appropriate inquiry is what the loss would have been if the defendant had not been caught." *United States v. Frisch*, 704 F.3d 541, 544 (8th Cir. 2013). "To assess the amount of loss caused by such a scheme, the Court must consider

the impact of the scheme as a whole." *United States v. Sandison*, No. 09-CR-0108 (PJS/LIB), 2011 WL 1596205, at *7 (D.Minn. Apr. 22, 2011) "Courts should consider collateral when determining the intended loss amounts[]. . . ." *United States v. Staples*, 410 F.3d 484, 490 (8th Cir. 2005). "If a reasonable person intends for the collateral to revert to the defrauded party (or understands that it will), then he or she does not intend to obtain the value of that collateral." *Id*. "Thus, sentencing courts should subtract the value of the collateral from the intended loss amount when the facts warrant it." *Id*. "The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." F.3d 541, 544. "For this reason, the court's loss determination is entitled to appropriate deference." *Id*.

## II.    SPECIFIC OFFENSE CHARACTERISTICS

### A. Loss Calculation

The PSIR correctly determines (and the Government does not contest) that there was no actual loss and therefore intended loss is applicable. Defendant believes that Mr. Wilcoxen is spot on in the first step of his calculation of intended loss, but he failed to take into account two key mitigating elements: intent and collateral.

The 8th Circuit has used the the following rationale in similar cases, although it apparently does not view it as a hard and fast rule: "the amount of intended loss attributable to [defendant] is the amount by which the fraudulent loans purchased by the financial institutions exceeded the amount that those institutions would have paid had they known the truth." *United States v. Miller*, 588 F.3d 560, 566 (8th Cir. 2009).

Interestingly, although the 8th Circuit expresses that proposition in *Miller*, it also found that "the district court did not clearly err in finding that there was no loss to attributable to Miller for sentencing purposes." In other words, it was not an abuse of discretion for the district court in *Miller* to find that there was no intended loss. *See also United States v. Carter*, 412 F.3d 864, 869 (8th Cir.2005) (providing that the proper measure for intended loss is the "amount ... by which the fraudulently-obtained loan exceeded the amount that the lenders would have lent on the property had they known its true value"); *Kok v. United States*, 17 F.3d 247, 250 (8th Cir.1994) ("[T]he measure of the loss that [the defendant] intended to inflict is the difference between the amount of credit the bank extended based on the false representations and the amount of credit the bank would have extended had it known the company's true financial condition.")

Defendant's position is that the intended loss was zero because he had no intent to inflict pecuniary harm and the Bank was provided collateral to ensure that no loss would occur. The two issues are linked, because providing collateral is evidence supporting a lack of intent to cause any loss.

### i. Intent

The notes to USSC 2B1.1, Notes table (c)(ii) defines "Intended loss" as: "(I) the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)."

The Defendant's position is that he did not intend for any bank to suffer pecuniary harm and that the intended loss amount should be zero. The analytical reasoning developed by the United States Sentencing Commission, fairness, and common sense all dictate that the specific facts of this offense be considered. A fraud where no loss is intended and no loss actually occurs is the least egregious type of fraud possible. This was not a naked, brazen fraud where the Defendant took something of pecuniary value from the victims leaving them with nothing while he laughed all the way to the bank. Quite the opposite. The Bank of Valley was paid the entire loan amount plus $500,000 in interest per the testimony of its President. The only personal gain that Mr. Luneke received was his 40% share of the carwash.  The $305,000 in "kickbacks" he received were used to reimburse $200,000 in family loans – money that was unquestionably put into this carwash. (*See* Trial Exhibit 821 - Summary – Aaron Deposits into Living Waters)  The other $105,000 was used to reimburse Mr. Luneke for out-of-pocket carwash expenses. The defense provided summary exhibits (which were not disputed by the Government at trial) showing that he had roughly $100,000 in out-of-pocket expenses for the carwash. (Trial Exhibits 823-827 - Summaries of Defendant's carwash expenses).  Mr. Luneke's position is that he did not "pocket" any of that $305,000 despite his subjective belief that he had earned at least that much through his hard work – all of that money was used to reimburse legitimate carwash expenses.

At trial, the work Mr. Luneke put in and the and money he spent out of pocket was largely uncontested by the Government.  The Government's argument was that it didn't matter whether Mr. Luneke earned the money or not. It didn't matter to the

Government's case nor the elements of the crime charged whether some of the money was a legitimate reimbursement for a carwash expense –he obtained it fraudulently.

That is likewise the extent of the jury's factual findings. The jury determined that Mr. Luneke: 1) knowingly attempted to execute a scheme or artifice to obtain any of the moneys, funds, credits, assets or securities owned by, or under the custody and control of, Stearns Bank by means of materially false or fraudulent pretenses, representations, or promises; and 2) the defendant did so with the intent to defraud. Those are the relevant elements of this conviction. The jury never found that Mr. Luneke did not put $200,000 in family loans into the carwash or did not spend over $100,000 on out-of-pocket carwash expenses. The evidence at trial – again, essentially undisputed – was that Mr. Luneke put his own money into the carwash along with money loaned from his family in order to successfully complete the carwash in time to take advantage of a completely legitimate tax incentive.

Mr. Luneke's hard work was undisputed at trial.  It is clear that – but for Mr. Luneke's work – this carwash would not have been completed in a timely fashion, if at all. That is a mitigating circumstance that is relevant to the loss calculation because it shows that Mr. Luneke had no subjective intent to cause a pecuniary loss: his intent was for everyone to benefit from their investment and he showed that intent through successfully constructing and running this carwash, something he does to the present day for no remuneration beyond his 40% stake.

The Government and the PSIR ignore the many mitigating facts involved here that are relevant to Mr. Luneke's intent.  Mr. Luneke's overarching intent was to

5

construct this carwash, manage it properly, and create a profitable investment for everyone involved, including any bank that held this loan. He was successful in that, as the undisputed evidence showed. The Bank was paid back every penny plus approximately $500,000 in interest. Patricia Broilette receives yearly interest checks and all the testimony indicated that the business would repay her fully. (Trial Exhibits 26, 27 - Payments to Patricia Brouilette). The current holder of the carwash loan – NBC Bank – is satisfied with the performance of the business and has received consistent payments and principal and interest.

The fraud that Mr. Luneke was convicted of played a very small role in the story of this carwash. The bulk of the story is a success story about an entrepreneur who faced immense challenges but who persevered through hard work and diligence to create a business that everyone who was involved with could be proud of and benefit from.

The Sentencing Guidelines draw a distinction between situations that amount to outright theft and situations like the one here where no loss was intended. Importantly, intended loss looks to the subjective intent of the defendant. Here, Mr. Luneke subjectively believed that he earned every bit of the $305,000 in "inflated invoices." The question at trial wasn't whether he was entitled to the money – the legal question for the jury was whether he obtained it through false representations. The undisputed evidence at trial was that Mr. Luneke did, in fact, do a massive amount of work on this construction and that $305,000 is a reasonable estimate of the value of that work.  The evidence supporting that proposition included expert witness

6

testimony as to typical general contractor fees and the fair market value of similar electrical services provided to similar carwashes.   It included appraisals and the testimony of the appraiser as to typical general contracting fees. (Trial Exhibits 47-50 - Appraisals).  In fact, various witnesses for both parties testified that general contracting fees are often as much as 10% to 15% of the total cost of labor and materials. Yet, the general contractor was confronted with his own bills showing that he was paid less than %5 of the total cost to construct this carwash, and those figures were never meaningfully disputed.

In summary the position of the PSIR is not accurate because Mr. Luneke's subjective intent was never to cause any pecuniary loss, and that intent is supported by all the evidence of his hard work.

### Analogous Cases – Bank Fraud

In *United States v. Sandison*, the district court concluded that the intended loss and actual loss were both zero for a conviction of conspiracy to commit bank fraud. 2011 WL 1596205, at *10. *Sandison* contains many parallels to this case.  The *Sandison* defendants were developers who procured millions of dollars in loans for a project. *Id*. The project was legitimate and the defendants' intent was to complete it successfully. Unfortunately, the project began to run out of money because the defendants had underestimated the total cost it would take to complete.  Instead of acting transparently with the bank, the *Sandison* defendants brought more money into the project without telling the bank.  Just like the case at bar, the practical result

was that the undisclosed loans were paid off first – they essentially cut the line in front of the Bank which should have been in the top lien position. *Id*. at 8.

The court emphasized that the defendants personally invested millions of dollars into the underlying development project and "acted in an attempt to help the RTC project succeed and eventually repay all of its loans." 2011 WL 1596205, at *9-10. In evaluating intended loss, the court held that sentencing courts must consider "the impact of the scheme as a whole", rather than only the allegedly fraudulently component of the transaction. 2011 WL 1596205, at *8. Because the defendants' conduct both provided substantial value to the project and benefitted the participating banks, the court rejected speculative theories of loss and found "the amount of loss in this case is zero." *Id*. at 10.

The *Sandison* case is an example of a District Court engaging with the analytical framework provided by the Sentencing Guidelines and caselaw and making a specific finding in an unusual fraud where the defendants did not intent to deprive their victims of any money.

> The defendants' scheme is therefore unlike the offense in *United States v. Mancuso,* 42 F.3d 836 (4th Cir.1994) and unlike the breach of fiduciary duty in *Helm Financial Corporation v. MNVA Railroad, Inc.,* 212 F.3d 1076 (8th Cir.2000)— two cases that the government cites in support of its amount-of-loss theory. The defendants in those cases only took money from their victims; they never provided money to their victims as part and parcel of their fraudulent schemes. In this case, by contrast, the fraudulent scheme of Sandison and Martinson involved both (1) putting $6,617,000 into the pockets of the participating banks, and (2) taking $6,617,000 out of the pockets of the participating banks. Thus, the amount of loss suffered by the participating banks as a result of Sandison and Martinson's scheme—the entire scheme, not just the part of the scheme on which the government focuses—was zero.

*Id*. at *10

This case is strikingly analogous. Mr. Luneke's intent was to be a successful entrepreneur, but he made mistakes. He underestimated the total cost, he underestimated the effect of COVID, and he came to the point where he believed he needed an additional injection of capital to successfully complete the carwash. He obtained that additional capital, but failed to disclose that to the bank. But his intention never changed – he wanted to build this business and pay off the loan. Mr. Luneke made mistakes, but he never intended to cause any loss and he did not cause any actual loss. Following the logic of *Sandison*, the loss estimation in this case should be zero.

### ii. Collateral

The notes to USSC 2B1.1, Notes table (c)(v) define reasonably foreseeable harm as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." There were two specific acts that underlie these convictions: 1) failure to disclose the Patricia Brouillette loan; and 2) submitting the fraudulent invoices for $305,000 after the carwash was completed and doing business.

That specific offense conduct and its timing is crucially important to the estimation of loss. That offense conduct occurred before the offense was detected. That is true for both Bank of the Valley, and for Stearns Bank. At the time of the offense conduct, and throughout the entirety of the history of this loan, the loan was fully guaranteed by

both Mr. Luneke and Mr. Fichter, and also backed by collateral equal to or greater in value than the entire $4.3 million final loan.

When the loan first came into being in April 2020, it was fully guaranteed. Mr. Luneke provided everything of value he had as collateral, including his home and his life insurance policy. (Trial Exhibit 17 - Loan Presentation Memo; 303 - Commercial Guaranty by Luneke); . Nathan Fichter provided significant additional collateral, including his businesses and real estate holdings. *Id.* The Patricia Brouillette $150,000 loan was used to buy the land on which the carwash sits. That land was valued at over $400,000 and provided as collateral to the Bank. (*See* Trial Exhibits 305 - Deed of Trust; 844 - Online Deed Search; 845- Deed of Trust). The public filing from the Nebraska Secretary of State submitted as evidence is clear – the Bank of the Valley perfected a security interest in the land in April 2020 at the time the loan originated. Thus, even if the $150,000 Patricia Brouillette loan that was fraudulently undisclosed to Bank of the Valley and Bank of Stearns was counted towards intended loss, the collateral held by the Bank should be credited against that amount. Likewise, although Bank of Stearns only reached the preliminary stage of a loan agreement, they terms of any loan would have included collateral that protected Bank of Stearns from any possible loss.

At the time the fraud was detected, the carwash was fully operational, and the Bank held the entire carwash as collateral against the possibility of non-repayment. Despite the Government's many arguments at trial regarding the supposed inflated value of the carwash, they presented no actual evidence that tends to cast doubt on the

10

appraised value of this carwash. Even the appraisal ordered by Bank of the Valley after the fraud was detected and Mr. Luneke was fired, concluding that the value was $4.5 million (despite not having information about actual revenues) – over $200,000 more than the total loan. (Trial Exhibit 50 -- Appraisal Report Darted August 2, 2022). Thus, because the Bank held collateral – the carwash itself – that was greater in value than the loan itself, that collateral should be credited against any intended loss.

The principle that the loan amount was always less than the value of the carwash provided was testified to by numerous witnesses: the Bank of the Valley sought a Loan-to-Value ratio of 80%. That means the Bank would only loan up to 80% of the confirmed value of the carwash. Even accounting for the $305,000 in "kickbacks" -- which only represents about 7% of 4.3 million --  at all times the Bank of Valley protected themselves by loaning significantly less that the value of the carwash per the appraisal it ordered.

Based on the loan agreement, the collateral provided, and the perfected security interests, the Bank of the Valley held, it is a fact that the Bank would have had the right to foreclose on the carwash and sell it on the open market in the event of default. Indeed, as Probation Office Wilcoxen acknowledged, "had the defendant defaulted on the loan to Bank of the Valley[] the potential loss, based on the inflated construction invoices, would have reflected $305,950.00." (Revised PSIR ¶ 56). Had the bank foreclosed on the completed carwash – it would not have experienced any loss. To the contrary, even by the most conservative appraisal the Bank of the Valley could

11

reasonably have been expected to experience a financial gain in the event of foreclosure. (Trial Exhibits # 47, 48 & 50).

Both the Sentencing Guidelines and the Eighth Circuit require the value of the collateral pledged to Bank of the Valley, prior to the detection of the fraud, to be included in calculating actual or intended loss. *See United States v. Martinez*, 690 F.3d 1083, 1088 (8th Cir. 2012); *United States v. Staples*, 410 F.3d 484 (8th Cir. 2005). The Revised PSIR does not reflect that there was ever an attempt to credit the collateral pledged to the bank prior to the detection of the fraud against the intended loss amount.

**Analogous Cases – Bank Fraud**

In *United States v. Martinez*, a bank fraud case, the defendant was a Chief Financial Officer who manipulated financial information in order to obtain additional financing from the bank. *United States v. Martinez*, 690 F.3d 1083, 1087 (8th Cir. 2012). The Eighth Circuit treated the conduct as analogous to inflating assets or misstating financial condition to secure a loan beyond what the borrower would have otherwise qualified for. *Martinez,* 690 F.3d at 1087.

"The government in *Martinez*, analogized the defendant's conduct to a check-kiting scheme, arguing that the amount of loss must be determined based on the amount in float 'at the time the check kiting scheme is discovered, not at the time of sentencing,' rendering the existence of collateral irrelevant." *Id.* at 1087. The government relied on *United States v. Whitehead*, 176 F.3d 1030 (8th Cir. 1999), however, the court reasoned *Whitehead* does not state that collateral can never be considered in determining the

12

amount of loss in a check-kiting case." *Id.* "The court found *Martinez*'s conduct more akin to a scheme to inflate assets or income in a loan application to obtain a loan in an amount greater than justified by the actual financial condition." *Id.*

Like *Martinez*, the defendant here was a Chief Financial Officer at Bank of the Valley and sought financing for a legitimate business, Legacy Express Car Wash. In order to qualify for that loan, he pledged collateral. (*See* Trial Exhibits 305 - Deed of Trust; 844 - Online Deed Search; 845- Deed of Trust); notably, prior to any detection of fraud. Here, a jury found that the defendant had misrepresented financial disclosures/debt schedules submitted to the bank and found him guilty of both counts of the indictment. The existence of pledged collateral in both cases is significant because the court in *Martinez* recognized that collateral must be considered in evaluating actual or intended loss, using the fair market value of the outstanding collateral at the time of sentencing.

Applying *Martinez*, the value of all of the collateral pledged by the defendant must be included in calculating loss, thereby bringing the amount of intended loss to zero. The defendant's business partner, Nate Fichter, told Probation Officer Wilcoxen that the current valuation of Shine Express Wash, LLC, and Living Waters RE, LLC is 5.4 to 5.7 million. (Revised PSIR ¶ 41) Additionally, the car wash is still fully operating and generating revenue at a healthy rate in Columbus, Nebraska. The defendant still works there daily, and the loan for Legacy Express Car Wash is currently held with Nebraska Bank of Commerce (NBC Bank). (Revised PSIR ¶ 43). NBC bank performed its own appraisal, which values the car wash at 9.2 million. (*See* Exhibit 101).

13

**Analogous Cases – Mortgage Fraud**

In *United States v. Staples*, a mortgage fraud case, the 8th Circuit analyzed the concept of intended loss where significant collateral existed that mitigated the actual loss to the bank. *Staples,* 410 F.3d at 490–91. The defendant in *Staples* conspired with the owner of the house to commit bank fraud.  The home owner had $76,000 in equity in his home. The fraud was simple, "Mr. Staples gave the title company a fake check for $249,493. the purchase price of the house." *Id*. The home owner received a check for his equity - $76,000. *Staples*, 410 F.3d at 490–91. Thus, the undisputed actual loss was $161,000, which was the sum of $76,000 lost by the title company and approximately $86,000 lost by the bank. *Id*. At 490. At sentencing, the parties disagreed on whether the intended loss amount should include or exclude the value of collateral that the bank retained, that is – the value of the home. The government proposed a loss amount representing the entire value of the home, arguing: "collateral is irrelevant because in its words, the guidelines instruct courts to ignore 'later payments or recoupments of money by victims' when calculating loss." *Id*.

The 8th Circuit rejected the government's arguments and subtracted the value of the collateral from the intended loss figure, explaining "intended loss is meant to be a measure of a defendant's culpability." *Id*. "To us, collateral is more like a pre-detection repayment than post-detection repayment because it bears on the defendant's culpability: the existence of collateral could indicate that the defendant intended to cause a smaller loss than would have occurred absent the collateral." Id. At 491. "Thus,

sentencing courts should subtract the value of the collateral from the intended loss amount when the facts warrant it." *Id*.

Similarly, the existence of collateral, and a 100% personal guaranty by Mr. Luneke, indicates that no loss was intended. As in *Staples*, the parties agree that there was no actual loss. The Government's position runs counter to the Sentencing Guidelines and caselaw in that it advocates for a loss amount for the full amount of the loan. That position is completely unsupported and ignores the actual facts of this case. Both the government and Probation fail to consider the collateral that was pledged from the very inception of this case, as well as the 100% guarantees by both Mr. Luneke and Mr. Fichter. (*See* Trial Exhibits 305 - Deed of Trust; 844 - Online Deed Search; 845- Deed of Trust). Further, the Government and Probation's position completely ignore the standard for potential loss -- Mr. Luneke's subjective intent.

Throughout this whole proceeding, Mr. Luneke's only subjective intent was to build his dream car wash, and get it up and running; it was never to cause any pecuniary harm to Bank of the Valley or Stearns Bank. Following the reasoning of *Staples*, the intended loss amount here should be zero.

**Distinguishable Case – Bankruptcy Fraud**

The government cites *United States v. Holthaus*, 486 F.3d 451 (8th Cir. 2007), a bankruptcy case, in its PSIR objections in support of the erroneous proposition that "for an attempted bank fraud (Count I), the intended loss is the amount of credit sought." (RPSIR at p. 26) Government's PSIR Objection 1). The government's reliance on *Holthaus* is misplaced. First of all, *Holthaus* is a bankruptcy case and the crime was

15

false declaration in connection with a bankruptcy petition. There was no credit sought in *Holthaus*, nor were any loans involved. *Id*. at 454. The defendant in *Holthaus* filed a bankruptcy petition in which he fraudulently concealed a number of assets. *Id*. at 453. In determining intended loss, the sentencing court simply added up the value of all the assets that were fraudulently not disclosed. *Id*. The defendant objected to the inclusion of some of those assets, but the 8th Circuit rejected his arguments and affirmed. *Id. at 456.*

The defendant in *Holthaus* clearly intended to cause pecuniary harm to the creditors of the bankruptcy estate by concealing assets and it was eminently reasonable for the court to estimate the loss amount by adding up the value of all those assets. However, *Holthaus* – as an example of loss calculation in a Bankruptcy case—is not particularly helpful to the case at bar. The intent of Mr. Luneke is not analogous. Furthermore, the bankruptcy process is not a good analytical fit for the facts here. *Holthaus* does not involve any collateral or intent to make its victims whole– it is simply a naked scheme to cause pecuniary harm to another.

If this Court were to use the analytical framework provided by *Holthaus*, it could add the $150,000 Patricia Brouillette loan to the $305,000 amount of inflated invoices for a total of $455,000. Yet the Court would also need to consider intent and collateral. At the time the loan originated, Bank of the Valley held significant collateral, including the land itself which was valued by the appraiser at $690,000. (Trial Exhibits 47-50 - Appraisals). ( Thus, even before taking into account the 100% personal guarantees — and other sources of collateral — which fully protected Bank of the Valley from any loss.

In summary, *Holthaus* is not analogous to the issues here. The Eighth Circuit estimated intended loss from the value of all of the concealed assets because the defendant offered no persuasive evidence that he intended creditors to recover those funds. Here, the defendant obtained a secured business loan: pledged the car wash itself as collateral; pledged any and all assets he had; gave a 100% personal guaranty; and moved forward with the intent to pay back every dollar loaned. This case is more analogous to *Staples*, and *Martinez*, where the Eighth Circuit recognized that collateral and intent must be considered in evaluating intended loss.

## B. Sophisticated Means

"The enhancement for sophisticated means applies when the offense involves 'especially complex or … intricate offense conduct pertaining to the execution or concealment of an offense." *United States v. Septon*, 557 F.3d 934, 937 (8th Cir. 2009); *See* also USSG § 2B1.1 cmt. 8(b); *United States v. Brown,* 877 F. Supp. 2d 736, 748–49 (D. Minn. 2012). ("One of the examples specifically mentioned by the Sentencing Commission is when a defendant "hid[es] … transactions … through the use of fictitious entities [or] corporate shells.")

Simply put, Mr. Luneke did not need to use sophisticated means for this offense because of the negligence of the Bank of the Valley. The Bank of the Valley's failure to detect and general negligence was not a defense at trial, and the defense was limited in its ability to elicit evidence and testimony on that subject. Nevertheless, significant evidence and testimony was adduced indicating that – had the Bank of the Valley

17

followed basic FDIC rules and regulations – this fraud would not have occurred. Both the President of the Bank and a member of the board's testimony indicated that they never scrutinized any of the 4 separate Loan Presentation Memos that they voted to approve. Officer account reviews and large deposit reiews – mandated by FDIC regulations – were apparently not conducted. The FDIC exam pointed out any number of issues with the loan yet the Bank of the Valley took no action whatsoever after the FDIC exam was completed to rehabilitate that loan. (See Exhibit 122- FDIC EXAM). Mr. Luneke didn't need to use sophisticated means because the Bank of the Valley's subpar compliance practices eliminated any need to do so.

Regarding the failure to disclose the Patricia Brouilette loan – no sophisticated means were used.  Mr. Luneke just didn't list the debt on any debt schedule.  He did nothing to hide the fact that Ms. Brouillette put this money into the account – in fact, one of the very first lines of the carwash first statement for the carwash checking account at Bank of the Valley included a check from Patricia Brouilette for $150,000. (Trial Exhibit 7, Bank of Valley Complete Accounts DDA 402168 Living Water).  All the bank had to do was look at the account!

For the "kickback" payments – Mr. Luneke simply asked the contractor and electrician to write him a check.  Neither the contractor nor electrician testified to any sophisticated means whatsoever.  When they sent these "kickback" checks, they wrote them on Bank of Valley checks and Mr. Luneke deposited those Bank of the Valley checks in to his personal account at Bank of the Valley. That was literally all that Mr. Luneke had to do.

18

Again, the Government argued many theories at trial, including that Mr. Luneke hid the existence of various entities in order to execute this fraud. The Government's theory was that Mr. Luneke essentially conspired with Mr. DuBray in order to provide Mr. DuBray a financial benefit through taxes. Yet the Government did not prove their theory by a preponderance of the evidence and the defendant put on significant evidence to the effect that this was a mistake in tax preparation that was fixed the following year. The defendant also put forward significant evidence that the other entities harped on by the Government were for the purpose of constructing another carwash in Norfolk. (Trial Exhibit 41 - Bank of Valley 2020-09-20 LPM Legacy Express (Norfolk)). The Government's own witness – Craig Foreman – corroborated that the Norfolk carwash project was discussed, vetted by attorneys but ultimately went unrealized. Evidence that Mr. Luneke created other entities for the purpose of engaging in different business activities does not justify the sophisticated means enhancement.

In summary, the evidence was that this was a fraud executed in a simple manner. Mr. Luneke requested money, and he received it. All of these transactions were open and notorious – they were right in front of the Bank of the Valley. No sophisticated means were necessary to execute this fraud and none were used.

### Analogous Cases – Wire Fraud

In *United States v. Brown*, the district court declined to apply the sophisticated means enhancement even where the defendant created an LLC, opened multiple financial accounts, transferred funds among accounts, solicited vendors in multiple

19

states, and forged documents. *Brown,* 877 F. Supp. 2d at 752. The court emphasized that sophisticated means requires conduct that is "especially complex or especially intricate" and "notably more intricate than that of the garden-variety offense." *Id*. The court found no sophisticated means because the defendant "did not create fictitious entities, corporate shells, or offshore financial accounts," but instead used "readily identifiable accounts at local banks." *Id*.

Unlike in cases involving layered concealment or shell entities, the conduct here involved a straightforward loan transaction, from Mr. Luneke and his partner, Nate Fichter. As previously mentioned, Mr. Luneke held all his personal and business accounts, as well as his loans, at Bank of the Valley. All accounts were located in the same house. There were also no fictitious entities or corporate shells. Like in *Brown*, the court should decline to apply the sophisticated means enhancement.

## Distinguishable Cases – Bank Fraud

In *United States v. Septon,* involved an elaborate and coordinated fraud scheme that justified the sophisticated means enhancement. *Septon*, 557 F.3d at 937. In *Septon*, the defendant operated a multi-year mortgage fraud enterprise through numerous affiliated business entities and subsidiaries, used sham employers to fabricate borrower income, concealed bridge loans from lenders, and submitted forged signatures, falsified tax returns, altered pay stubs, fraudulent bank statements, and forged notary stamps. F.3d 934, 937. The Eighth Circuit affirmed the sophisticated means enhancement because the defendant used multiple entities and fabricated documents to conceal the true nature of transactions from lenders. *Id*.

20

The present case involves a straightforward commercial loan transaction secured by openly pledged collateral, with no fictitious entities, shell companies, forged documents, sham employers, or layered concealment mechanisms. The conduct in this case, where the defendant omitted the Patricia Brouillette loan and asked Craig Foreman and Chris Langer to inflate their invoices because he subjectively believed he earned that money, and was paying himself back, is not "especially complex or especially intricate" within the meaning of § 2B1.1(B)(10)(C). For all of these reasons, the two-level enhancement of sophisticated means should not apply in this case.

### C.  Role Adjustment – Abuse of Position of Trust

"According to the relevant Guideline, the enhancement applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." *United States v. Nock*, 148 F.4th 607, 619 (8th Cir. 2025); *See* also USSG § 3B1.3.; *United States v. Rubashkin,* 718 F. Supp. 2d 953 (N.D. Iowa 2010). "Applying this enhancement is "not a simple task," as "there is a component of misplaced trust inherent in the concept of fraud." *Id*.; "The enhancement therefore doesn't apply in every fraud case; it applies when "the victim placed a special trust in the defendant beyond the ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario." *Id*.

Here, Mr. Luneke did not abuse his position in order to execute this fraud. In fact, as a matter of FDIC "Reg "O" regulations, the Bank of the Valley was obligated to treat Mr. Luneke no differently than any other bank customer. This loan was

21

presented to the Board of Directors like any other loan would be.  The Board had the opportunity to scrutinize it, ask any questions or request additional information – they did not do so despite the fact that the Loan Presentation Memo remained largely unchanged the entire time. If Mr. Luneke had somehow used his position to subvert the Bank of the Valley's process, then the enhancement would apply.  But there is no evidence that he did so – he simply engaged in the same loan process that every other customer did.  He is not culpable for the failure of the Bank of the Valley to properly scrutinize this loan. In other words – the evidence at trial indicated that anybody could have executed this fraud because Bank of the Valley's practices and procedures were substandard.

**Distinguishable Cases – Bank Fraud**

In *United States v. Rubashkin*, the district court declined to apply the abuse-of-position-of-trust enhancement even though the defendant, a corporate vice president, engaged in a multi-year bank fraud scheme involving falsified collateral certificates, fake invoices, forged bills of lading, manipulation of accounting records, diversion of receivables, and millions of dollars in fraudulent borrowing. *Rubashkin*, 718 F. Supp. 2d at 953, 975 (2010). Although the defendant exercised managerial authority within the borrowing company and personally executed loan documents, the court concluded that the enhancement did not apply. *Id.* at 980. The lending relationship remained an ordinary commercial borrower-lender relationship governed by collateral requirements, borrowing-base calculations, certifications, and institutional oversight. *Id.* at 980-981.

Likewise, here, the lending relationship Mr. Luneke had at Bank of the Valley, even as a Chief Financial Officer, remained an "ordinary commercial borrower-lender relationship governed by collateral requirements, borrowing-base calculations, certifications, and institutional oversight." *Id*. Mr. Luneke applied to the bank for the loan and followed their procedures, providing the necessary documentation for collateral pledging, credit checks, etc. His loan officer then had to take that to the Board of Directors for final approval. Although he was found guilty of misrepresenting his financials, there was no abuse of his position as Chief Financial Officer in doing so. Further, there was no "forged bills of lading, manipulation of accounting records, diversion of receivables, and millions of dollars in fraudulent borrowing." *Id*. Nothing of that nature. For these reasons, the two-level enhancement of the abuse-of-position-of-trust should not apply in this case.

### Distinguishable Cases – Wire Fraud

In *United States v. Nock,* the Eighth Circuit emphasized that the abuse-of-trust enhancement does not apply to every fraud case. *United States v. Nock*, 148 F.4th 607 (8th Cir. 2025). Rather it applies only, if "the victim placed a special trust in the defendant beyond the ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario." *Id*. At 619-620. The court upheld the enhancement in *Nock* because the defendants operated as investment professionals exercising broad discretionary authority over investor funds with minimal supervision. *Id*. at 612.

Unlike *Nock*, the present case involves an ordinary commercial lending transaction through Bank of the Valley. Mr. Luneke did not operate with broad

23

discretionary authority. Evidence during the trial demonstrated that Mr. Luneke

followed standard bank protocol, whatever that looked like at the time, to apply for a

loan and gathered and provided all the documentation needed for the Loan

Presentation Memos. Additionally, testimony during the trial demonstrated that Mr.

Luneke respected the bank's chain of command. He requested the loan through his

loan officer, who then took the loan request to the Board of Directors for final

approval. Further evidence at trial demonstrated that Mr. Luneke was following

procedures when it came to requesting additional funds for invoices. There was no

broad discretionary authority that Mr. Luneke exercised. Mr. Luneke was ultimately

found guilty of misrepresenting his financials, but in doing so, he did not use any of his

bank "authority" in doing so.

### D. Role Adjustment – Role as an Organizer and Leader

In *United States v. Morris*, the court explains:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as 'kingpin' or 'boss' are not controlling. Factors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

*Id*. at 568-69.

In *Morris*, the Eighth Circuit applied the § 3B1.1(c) organizer/leader

enhancement where the defendant exercised direct control over subordinate bank

24

employees, recruited another individual to participate in the scheme, directed the opening and maintenance of fraudulent accounts, and orchestrated acts designed to conceal fraud. 18 F.3d 562, 569. The court emphasized factors such as recruitment of accomplices, decision-making authority, planning and organizing of the offense, and control exercised over others. *Id*. at 568-69.

Unlike in *Morris*, the present case does not involve a coordinated multi-person fraud scheme, supervision of subordinate employees, recruitment of accomplices, or operational control over institutional banking functions. Crucially, neither the electrician nor the contractor testified that they knowingly engaged in any fraud. They were not "recruited" to engage in fraud – they testified that they believed there was a legitimatize reason behind the "kickbacks."

### E.  Zero Point Offender

§ 4C1.1 states all of the criteria to qualify as a zero-point offender. It includes in paragraph No. 10 that the defendant should not receive an adjustment under § 3B1.1, for aggravating role as discussed above. For those reasons, the § 3B1.1(c) organizer/leader enhancement should not apply in this case, as the defendant meets all of the criteria set forth in § 4C1.1.

In addition, § 5C1.2, (10)(B), states as follows: A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under § 4C1.1 and the defendant's applicable guideline range overstates the gravity of the offense because the offense of the conviction is not a crime of violence or an otherwise serious offense.

25

### F. Obstruction of Justice

"A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). "Of course, not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury." *Id.* at 95. "As we have observed, an accused may give inaccurate testimony due to confusion, mistake, or faulty memory." *Id.* "Her testimony may be truthful, but the jury nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent." *Id.* "For these reasons, if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." *Id.*

The government cited *Dunnigan* in their Objection 6 to the Revised PSIR, requesting the two-level enhancement under § 3C1.1, elaborating on two points: 1) that Mr. Luneke could not have possibly forgotten about the Patricia Brouillette loan of $150,000 and 2) that his explanation about his services rendered was fabricated. The government's assertion that Mr. Luneke could not have possibly forgotten is unsound and unreasonable.

In fact, Mr. Luneke's testimony was that – at the time he filled out a debt schedule for Stearns Bank – he mistakenly failed to include the Patricia Brouillette

loan.  He did not testify that he forgot about the loan entirety, he just made a mistake and forgot to include it on that one document. (Trial Exhibit 115). Importantly, Bank of the Valley never asked for any debt schedules and there was no evidence that he made any affirmative representations to the Bank of the Valley concerning Patricia Brouilette.  Mr. Luneke explained at trial that he was juggling a number of roles that contributed to his forgetfulness as regards that debt schedule.  He was acting as the CFO of the Bank, a father and husband, the operator of a newly constructed carwash, and was also actively pursuing other entrepreneurial opportunities, such as constructing another carwash in Norfolk.

Mr. Luneke did not interact or have contact with Ms. Patricia Brouillette, but once at the beginning of the car wash site, to say thank you. Yet, they had not interacted since, until her testifying in trial.

Second, the government claims that Mr. Luneke's testimony about the agreements he made with Craig Foreman and Chris Langer were fabricated. In his version of events Craig Foreman took the stand and admitted to cooperating with the government in an effort to please it. He also testified to not doing all of the work, and that Aaron did perform work. Chris Langer took the stand and admitted he did not want to be there testifying, and still considered Mr. Luneke a good man. He also testified to Aaron performing work on the car wash. The evidence presented at trial showed that Mr. Luneke performed extensive work at his car wash alongside Craig Foreman and Chris Langer.

27

In fact, several witnesses were incredulous at the suggestion that any general contractor would fail to bill and receive payment for the work they actually did.  Again, as previously discussed, Mr. Foreman's bills indicate that he was paid less than 5% of the total construction costs. His testimony that he did not know what the $200,000 was for was not credible – it was clearly for the work Mr. Luneke did acting as a general contractor. Every single witness with direct knowledge agreed that Mr. Luneke was acting as the general contractor and not Mr. Foreman.

Any reasonable person could infer that, unless agreed upon between all parties doing the work, one would not be found on a construction site just for the fun of it, doing work for free.

In any event, Foreman and Langer's testimony was not credible, as both claim they didn't know what the increased invoices were for. Credible evidence and reasoning suggest that it was obvious due to the work performed by Mr. Luneke that For these reasons, we ask that the two-level enhancement under § 3C1 not be applied in this case.

## CONCLUSION

Mr. Luneke's position is that he is at criminal history category 1, offense level 5, with an advisory guideline range of 0-6 months, as supported by the table below.

| Paragraph # | Description | Revised PSIR | Defendant's Calculation |
|---|---|---|---|
| 55 | Base Offense Level | 7 | 7<br>No objection. |

28

| 44 & 56 | Specific Offense Characteristics: 12-Level Enhancement under 2B1.1(b)(1)(G) | 12 | 0 Objection. No intended loss. |
|---|---|---|---|
| 45 & 57 | Specific Offense Characteristics: Sophisticated Means | 2 | 0 Objection. |
| 46 & 59 | Adjustment for Role: 2-Level Enhancement under 3B1.3 for Abuse of a Position of Public or Private Trust | 2 | 0 Objection. |
| 47 & 60 | Adjustment for Role: 2-Level Enhancement under 3B1.1(c) for Directing Others | 2 | 0 Objection. |
| 51 & 61 | Adjustment for Obstruction of Justice 2-Level Enhancement under 3C1.1 | 2 | 0 Objection. |
| 62 | Adjusted Offense Level | 27 | 7 Objection. |
| 48 & 63 | Chapter Four Adjustment: Zero-Point Offender | 0 | -2 Objection. |
| 65 | Total Offense Level | 27 | 5 Objection. |

AARON T. LUNEKE, Defendant,

By:   *s/Stuart J. Dornan*
STUART J. DORNAN, #18553
Dornan, Troia, Howard, Breitkreutz
Dahlquist & Klein, PC LLO
1403 Farnam Street, Suite 232
Omaha, NE  68102
Ph.: (402) 884-7044
Fax: (402) 884-7045
stu@dltlawyers.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2026, I electronically filed the foregoing document with the Clerk of the District Court using the CM/ECF system which sent notification of such filing to the following:

N/A – Filed Under Seal

and I hereby certify that I have emailed the document to the following non CM/ECF participants:

Sarah A. Hinrichs, Assistant United States Attorney
Alejandro A. Abreu, Assistant United States Attorney
Travis E. Wilcoxen, United States Pretrial Services and Probation Officer

s/Stuart J. Dornan
STUART J. DORNAN, #18553
Attorney for Defendant