IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 8:24CR-124 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S RESPONSE** |
| vs. | ) | **TO GOVERNMENT'S POSITION** |
| | ) | **REGARDING UNRESOLVED** |
| AARON T. LUNEKE, | ) | **OBJECTIONS TO REVISED PSIR** |
| | ) | |
| Defendant. | ) | |

COMES NOW the Defendant, Aaron Luneke, by and through his attorney, Stuart J. Dornan, and respectfully submits his responses to the Government's Position Regarding Unresolved Objections to Revised PSIR at Filing. No. 141:

### I.     Loss Calculation Under USSG §2B1.1(b)(1)

The Defense reiterates the arguments set forth in the Statement of Position Defendant, filed on or about May 15, 2026, in respect to the loss calculation. (Filing No. 139). In response to the Government's Loss Calculation under USSG § 2B1.1(b)(1), Defendant offers the following:

- In response to Section B, while the Government correctly identifies controlling precedent, its analysis and application to the facts here is incorrect. *Miller* does not elucidate the "but for" test the Government advocates. *See United States v. Miller*, 588 F.3d 560, 566 (8th Cir. 2009) ("Here, the amount of intended loss attributable to Miller is the amount by which the fraudulent loans purchased by the financial institutions exceeded the amount that those institutions would

have paid had they known the truth."). The Government had every opportunity to elicit testimony to the effect of whether or not a "rational lender would have made the loan on truthful inputs" and failed to do so. The Bank of the Valley President Lavicky could have spoken to this matter at Trial, and the Government did not elicit this testimony; and now seeks to rely on a "rational lender" standard without supportive case law that this is the standard that governs.

Obviously, no financial institution would agree to loan money if they knew it was based on fraudulent information. But not all information provided to the banks in this case was fraudulent. The vast majority of the information provided by Defendant was accurate, and the carwash endeavor was a viable project. If these banks had known the complete picture they would have either lent less money, obtained additional collateral, or some combination of both.

The Government positions themselves in the role of the rational lender to argue that the loans would not have been issued despite failing to ask their own fact witnesses the same. Defendant respectfully offers that this is an issue that can be determined factually and should not be relied upon based on simple argument when the facts are available to be determined.

Ultimately, the results speak for themselves. This carwash was a legitimate business project that has developed into a successful business. The Government's assertion that "no rational lender would have made the loan on truthful inputs" is unsupported by any evidence. (Filing No. 141, at p. 4). In

fact, evidence at trial established that a rational lender – NBC Bank – loaned the entire $4.3 million amount with full knowledge of the family loans in question. NBC President Joel Clements also testified that he and a board member spoke at length with federal investigators and knew that Defendant was under investigation, although they did not know the specifics. NBC Bank still made this loan. As happens with loans, NBC Bank balanced the risk by obtaining more collateral from the borrowers.

Further, Defendant directs the Court's attention to *United States v. Oligmueller* for guidance on how intended loss is defined: it "mean[s] just that – the loss the defendant intended to cause to the victim." 198 F.3d 669, 671 (1999), citing *United States v. Wells*, 127 F.3d 379, 745 (8th Cir. 1997). This means that intended loss is not synonymous with possible or potential loss to the victim. Specifically, in *Oligmueller*, the court affirmed a district court's determination that the intended loss was zero because there was no evidence that the defendant, at the time of the fraudulent conduct, intended to pay anything less than the full value of the loans. *Id.* at 671. This case is directly on point—and even further on Defendant's side of the scale, not only is there "no evidence that the defendant . . . intended to pay anything less than the full value of the loans": in this case, there is affirmative evidence in the trial record that Defendant *did* intend to pay back the full value of the loans. (Filing No. 139 at 6-7).

- In response to Section D, Defendant offers that even if the loss aggregates, the collateral perfected by both Bank of the Valley and Stearns Bank offsets that loss total, resulting in a loss of zero. In *United States v. Parish*, the court affirmed a loss calculation that combined 195 fraudulent mortgage loans obtained from 24 separate lending institutions, totaling approximately $85,020,128 in loan proceeds – *reduced by collateral values* – resulting in an aggregate loss estimate of over $40 million. 565 F.3d 528 (2009). The reduction of loss by the amount of collateral is established precedent and should guide this Court when determining the aggregate loss amount.

- In response to Section E, Defendant reiterates his response to Section B.

- In response to Section F, Defendant reiterates his response to Section B.

Thus, the Government's position on loss is based on an incorrect reading of *Miller*, as well as an unreasonable interpretation of the evidence. The evidence does not support by the preponderance standard that the intended loss is equal to the aggregate amount of the potential loan in Count I and the actual loan in Count II.

## II. Substantial Financial Hardship pursuant to USSG §2B1.1(b)(2)(A)(iii)

### A. Legal Standard

USSG § 2B1.1(b)(2)(A)(iii) provides a 2-level enhancement where the offense "resulted in substantial financial hardship to one or more victims." The list of factors is as follows:

> In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim — (i) becoming insolvent; (ii) filing for bankruptcy. . . ; (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit.

USSG § 2B1.1, comment. (n4(F)). *See also* Government's Position (Filing No. 141).

B.   <u>Revised PSIR Correctly Determines Business Partner Nate Fichter Did Not Suffer Substantial Hardship as Defined by USSG § 2B1.1(b)(2)(A)(iii)</u>

The Revised PSIR correctly determines that Mr. Luneke's business partner Nate Fichter did not suffer substantial financial hardship. (Revised PSIR ¶ 27). In the Revised PSIR under *Probation Officer's Response* (Revised PSIR ¶ 27), Mr. Wilcoxen states, "Although Mr. Fichter experienced some loss and was forced to restructure his own financial holdings, it does not appear he suffered a Substantial Financial Hardship as defined by USSG § 2B1.1(b)(2)(A)(iii)." (Revised PSIR ¶ 27).

Indeed, Mr. Fichter has not suffered any of the harms elucidated by the Guidelines and has in fact received a significant benefit as a result of Defendant's hard work. Mr. Fichter stated "that the current valuation for Shine Express Wash, LLC and Living Waters RE, LLC is 5.4 to 5.7 million. (Revised PSIR ¶ 41). "As such, his investment in the company will see positive dividends." (Revised PSIR ¶ 41). NBC Bank currently holds the loan on this carwash and recently had an independent which determined the market value was 9.2 million. (Filing No. 140, Ex. 101).

There is no evidence of any substantial hardship. The Government has cited to no analogous cases supporting their contention that a millionaire investor who is forced to inject some additional capital into a business he owns suffers a substantial hardship. Mr. Fichter invested a few hundred thousand dollars and he received a 60% stake in a successful business worth millions. That is not substantial hardship.

### III. Gross Receipts in Excess of $1,000.000 pursuant to USSG § 2B1.1(b)(17)(A)

#### A. Legal Standard

USSG § 2B1.1(b)(17)(A) states that, "the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant *individually*, rather than to all participants, exceeded $1,000,000" (emphasis added). "The comments make clear that the defendant must derive more than $1,000,000 in gross receipts individually, rather than the amount derived collectively by the participants." USSG § 2B1.1(b)(14)(A) cmt. n. 11.; *See* also *United States v. Adetiloye*, No. 3:08-cr-28, 2012 WL 140408, at *6 (D.N.D. Jan. 18, 2012). "Gross receipts from the offense" includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense. *See* 18 U.S.C. § 982(a)(4). To trigger a two-level sentencing guideline increase for deriving more than $1,000,000 in gross receipts from financial institutions, at least in a case involving property held by a financial institution for a depositor, the financial institution (1) must be the source of the property, that is, have some property rights in the property, and (2) must have been victimized by the offense conduct. USSG § 2B1.1(b)(17)(A); *See also United States v. Muho*, 978 F.3d 1212 (11th Cir. 2020).

In *United States v. Adetiloye,* a mail fraud case, the court emphasized that the enhancement focuses on receipts obtained personally by the defendant, not amounts collectively obtained by all participants in a broader scheme. *Adetiloye*, 2012 WL 140408, at *6. There, although the fraud scheme caused losses to amount to over $1,000,000 and involved multiple participants, the court declined to apply the enhancement because the government failed to establish by the preponderance of the evidence that Adetiloye himself personally received more than $1,000,000. *Id*. at *6. The court reasoned that participation in a fraudulent scheme, is insufficient absent proof that the defendant individually derived the qualifying amount. *Id*.

Similarly here, the Government cannot show that Defendant derived more than $1,000,000 in gross receipts. The evidence at trial was that Defendant put his own money into the carwash along with money loaned from his family in order to successfully complete the carwash in time. Moreover, the evidence at trial demonstrates the funds derived from the loans at issue were invested into the carwash business and not into Defendant personally. (Trial Exhibits 823-827: Summaries of Defendant's carwash expenses). The legitimate carwash business generated significant value and collateral, and his business partner, Mr. Fichter, maintained an ownership interest in the project.

In *United States v. Muho,* the Eleventh Circuit explained that the enhancement requires proof that the financial institution was both the source of the funds and a victim of the fraudulent conduct. *Muho*, 978 F.3d at 1224. There, the defendant used fraudulent documents to convince HSBC-Monaco that he held

authority over another entity's bank account, causing the bank to transfer more than $2,000,000 into an account controlled by the defendant. *Id*. The court explains:

> Muho used fraudulent documents to convince the bank that he had control over the account of another, thereby inducing the bank to wire the funds of another to Muho's account without even looking at the third base coach to see if it should swing or not. The bank swung away and made contact. Muho caught the funds and made out of the stadium gates like a bat out of Boston. *Id*.

This case is fundamentally different from *Muho*, wherein the court provides a vivid description of a straightforward theft scheme in which the defendant manipulated a financial institution into surrendering money for his own personal gain. Defendant used the loan proceeds to build and operate a legitimate carwash business that remains successful, has substantial collateral value, and continues to benefit its investors, Defendant and Mr. Fichter, as well as its lender, NBC Bank. (Revised PSIR ¶ 41). Defendant did not run away with the funds. The evidence at trial demonstrated that Defendant put all the funds into the carwash, along with some additional personal funds. (Trial Exhibits 823-827 - Summaries of Defendant's carwash expenses).

## IV.    Conclusion

Defendant asserts that a review of the guiding case law in this matter demonstrates that it is clear that the intended loss in this matter is zero, and the enhancements under USSG § 2B1.1(b)(2)(A)(iii) (Substantial Hardship) and USSG § 2B1.1(b)(17)(A) (Gross Receipts in Excess of $1,000,000) are clearly inapplicable to

this case. Defendant respectfully offers this Response to the Government's Objections

for the purposes of determining the correct Advisory Guideline Range in this matter.


AARON T. LUNEKE, Defendant,

BY:   s/Stuart J. Dornan
STUART J. DORNAN, #18553
Attorney for Defendant
Dornan, Howard, Breitkreutz
Dahlquist & Klein, PC LLO
1403 Farnam Street, Suite 232
Omaha, Nebraska 68102
(402) 884-7044
stu@dltlawyers.com


CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2026, I electronically filed the foregoing document with the Clerk of the District Court using the CM/ECF system which sent notification of such filing to the following:

Sarah Hinrichs, Assistant United States Attorney
Sean P. Lynch, Assistant United States Attorney
Alejandro A. Abreu, Assistant United States Attorney

and I hereby certify that I have emailed the document to the following parties:

Travis E. Wilcoxen, United States Probation and Pretrial Services Officer

s/Stuart J. Dornan
STUART J. DORNAN, #18553
Attorney for Defendant