IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>AARON T. LUNEKE,<br><br>  Defendant. | 8:24CR124<br><br>GOVERNMENT'S SENTENCING MEMORANDUM |

The United States of America, by and through its undersigned attorneys, submits this memorandum in aid of sentencing. On March 6, 2026, a jury convicted the defendant, Aaron T. Luneke, of attempted bank fraud (Count I — Stearns Bank) and bank fraud (Count II — Bank of the Valley), in violation of 18 U.S.C. §§ 1344, 2. For the reasons set forth below and those to be articulated at the sentencing hearing, the United States respectfully requests that the Court impose a sentence of imprisonment within the properly calculated advisory Guidelines range — 168 to 210 months on the Government's calculation or within the range the Court adopts after resolving the parties' objections — and deny the defendant's motion for a downward variance.

## I. INTRODUCTION

For nearly four years, the defendant was the Chief Financial Officer of Bank of the Valley, an FDIC-insured community bank headquartered in Columbus, Nebraska. While he held that office, he borrowed millions of dollars from his own bank to build a car wash — and he made certain the numbers worked. He directed his general contractor and his electrician to inflate their final invoices by $200,000 and $105,000, respectively (Tr. 192:9–17; 195:1–11); he pushed those inflated "costs" toward the appraised value that set the loan-to-value ratio, telling Stearns Bank's loan officer that adding the two final invoices to the appraisal produced an 81 percent loan-to-

value ratio (Tr. 194:2–9); he omitted roughly half a million dollars in personal and company debts from the financial disclosures he gave the lender he was courting (Tr. 190:21–23); and he concealed that he had arranged for a share of his ownership interest to flow toward the bank's own senior lending officer, John DuBray (Tr. 178:5–9; 179:7–10, 182:21–183:14). When the loans funded, the inflated invoice amounts came back to him as checks deposited into his personal account, and he used them — that same week — to pay the concealed family debts. (Tr. 199:11–18; 205:17–206:2.)

The jury heard this evidence and rejected the defendant's good-faith defense on both counts. But the verdict does not capture everything that happened at trial. The defendant took the stand for two days and, on the matters at the core of the case, testified falsely: about compensation "agreements" with the two contractors that both contractors deny; about where the $305,000 went; about "forgetting" debts he was actively servicing; and about the documented, months-long paper trail by which he routed tax benefits to himself and to his own loan officer. Part III of this memorandum sets out proposed findings under *United States v. Dunnigan*, 507 U.S. 87 (1993), supporting the two-level obstruction enhancement the Presentence Report properly applies and the defendant contests. Parts IV and V explain why the 18 U.S.C. § 3553(a) factors call for a sentence within the advisory Guidelines range, and why the defendant's arguments for a downward variance fail.

## II. THE ADVISORY GUIDELINES RANGE

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which is "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *see United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009).

2

The Revised Presentence Report calculates a total offense level of 27 and a criminal history category of I, yielding an advisory range of 70 to 87 months: a base offense level of 7 (USSG § 2B1.1(a)(1)); a 12-level increase for a loss of $305,950 (§ 2B1.1(b)(1)(G)); 2 levels for sophisticated means (§ 2B1.1(b)(10)(C)); 2 levels for abuse of a position of trust (§ 3B1.3); 2 levels for the defendant's aggravating role (§ 3B1.1(c)); and 2 levels for obstruction of justice (§ 3C1.1). (PSR ¶¶ 44–65)

Three Government objections remain unresolved and are fully briefed in the Government's Position Regarding Unresolved Objections to Revised PSR (Filing No. 141): (1) the intended loss is $7,820,000, supporting an 18-level enhancement under § 2B1.1(b)(1)(J) in place of the PSR's 12; (2) the offense resulted in substantial financial hardship to Nathan Fichter (§ 2B1.1(b)(2)(A)(iii)); and (3) the defendant individually derived more than $1,000,000 in gross receipts from one or more financial institutions (§ 2B1.1(b)(17)(A)). Sustaining the loss and gross-receipts objections yields a total offense level of 35 and an advisory range of 168 to 210 months at criminal history category I. The Government incorporates that briefing by reference rather than repeat it here. The defendant, for his part, objects to every enhancement and asks the Court to find a total offense level of 5 and a range of 0 to 6 months (Filing No. 139) — a calculation that would grade a jury-convicted, multi-million-dollar bank fraud by a bank insider as the Guidelines equivalent of a first-offense petty theft.

One disputed adjustment warrants full treatment in this memorandum. The defendant objects to the PSR's obstruction-of-justice enhancement (PSR ¶¶ 51, 61; Filing No. 139, § II.F), and because that enhancement rests on the defendant's own trial testimony, the Court "must review

the evidence and make independent findings" that the defendant committed perjury. *Dunnigan*,

507 U.S. at 95. Part III identifies the specific false testimony and supplies proposed findings.[1]

### III. THE OBSTRUCTION ENHANCEMENT: THE DEFENDANT COMMITTED PERJURY AT TRIAL

**A. Legal Standard**

The Guidelines add two levels where "the defendant willfully obstructed or impeded, or

attempted to obstruct or impede, the administration of justice with respect to the investigation,

prosecution, or sentencing of the instant offense of conviction," and the obstructive conduct related

to the offense of conviction or relevant conduct. USSG § 3C1.1. "Committing, suborning, or

attempting to suborn perjury" is a covered example. *Id.* cmt. n.4(B). A witness commits perjury

when he "gives false testimony concerning a material matter with the willful intent to provide false

testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at

93; *accord United States v. Swick*, 334 F.3d 784, 787 (8th Cir. 2003); *United States v. Chadwick*,

44 F.3d 713, 715 (8th Cir. 1995). "Material" information is information "that, if believed, would

tend to influence or affect the issue under determination." USSG § 3C1.1, cmt. n.6. Because the

defendant objects, the Court must make independent findings, by a preponderance of the evidence,

as to falsity, materiality, and willfulness. *Dunnigan*, 507 U.S. at 95; *United States v. Petrovic*, 701

F.3d 849, 859 (8th Cir. 2012). The enhancement may not rest solely on the jury's disbelief of the

defendant's denial of guilt. *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999); USSG §

3C1.1, cmt. n.2.

The Government accordingly does not rely on the defendant's blanket denials of fraudulent

intent (e.g., Tr. 3:18–23; 150:17–151:25; 240:2–241:14), although the jury necessarily rejected

---

[1] Citations in the form "Tr. __:__" are to the certified transcript of the defendant's trial testimony given March 4–5, 2026.

them. It relies on five discrete factual assertions — each specific, each material, and each refuted by documents, by the other witnesses, and in large part by the defendant's own admissions on cross-examination. The defendant framed his defense himself: "Q. And your testimony here today is that you forgot and you made mistakes. A. Yes." (Tr. 156:3–5.) The record establishes the opposite: he remembered, and he chose.

## B. Proposed Findings

**1. The invented "agreement" with Craig Foreman.** The defendant testified that his $200,000 addition to Foreman Lumber's final invoice reflected a specific compensation agreement, reached in person:

> Q. Describe the conversation.
> A. It was very short. Craig is a man of few words, and I just stated the amount
> of involvement I'd had in this project and the work that I've added to it,
> there's a value that's tied to that, and this is what that value is, and he agreed.
> (Tr. 29:19–23.)

He added that he met Foreman in March 2021, presenting a 100-ounce silver bar, "to have the adjustment, the inclusion on the final invoice for my — my efforts." (Tr. 30:13–16.)

That testimony is false. Foreman testified that no such conversation occurred and that he did not know what the additional $200,000 was for — testimony the defendant acknowledged from the stand. (Tr. 30:4–6) The documents corroborate Foreman: the $569,700 final invoice was prepared at the defendant's direction (Tr. 192:15–17), on editable Word invoices Foreman supplied (Tr. 192:18–19); the defendant admitted it "included $200,000 that Mr. Foreman did not earn" (Tr. 192:9–14); and he admitted that when he emailed the Foreman final invoice to Stearns Bank he "knew that they included amounts that were not supposed to go to those contractors, that they did not earn" (Tr. 196:25–197:4). No one else knew of any agreement to pay the defendant for his sweat equity: his business partner testified there was none, and the defendant conceded the point — "Q. Was Nate Fichter lying when he said there was no agreement to pay you to do work

on the car wash? A. No. Q. You just decided you were gonna pay yourself; right? A. Yes. Q. No one at the bank knew. A. No." (Tr. 159:17–24.) The invoices themselves did not say they were "for Mr. Luneke's work." (Tr. 159:24–25.)

The testimony was willful, not confused. The defendant explained away Foreman's contrary account by telling the jury Foreman was "completely scared" because he "had an agreement with folks here in the room for prosecution immunity" (Tr. 30:7–10) — even while acknowledging that Foreman had voluntarily "came in and told the United States about conduct that the government didn't even know about" (Tr. 199:7–10). And the testimony was material under Application Note 6: the invented agreement was the linchpin of the good-faith defense to the charged false pretense — the inflated invoice itself.

**2. The invented "agreement" with Christopher Langer.** The defendant gave parallel testimony about the $105,000 he added to Langer Electric's final invoice — an agreement supposedly reached "[m]id-December 2020 … around between 1 and 2 a.m.," while "[Langer] and [Luneke] were standing in the dryers," in which Langer "was in agreement" that the defendant's additional work "had a value assigned to it." (Tr. 33:5–17.)

Langer testified there was no such agreement. (Tr. 204:16–19.) There was no writing, no text message, and no witness. (Tr. 204:8–15.) Unlike Foreman, Langer had no agreement with the Government (Tr. 204:20–24), and the defendant calls him "a great guy" (Tr. 204:21) — leaving the defendant no explanation except that his friend, too, was "scared" (Tr. 37:7–10). The defendant admitted that the $105,000 he added to the roughly $45,000 he actually owed Langer "was not for work that Mr. Langer completed," that the invoice "was not accurate" (Tr. 195:1–11), and that its one-line description — "Complete electrical for Sonny's car wash. This consists of labor and materials for the project" — described labor and materials Langer never provided (Tr. 195:19–22;

6

Gov. Ex. 118). A meeting fixed at one o'clock in the morning, under the dryers, with no witnesses and no record, is not the kind of detail a truthful witness misremembers; it is precision in the service of unverifiability. The statement was material for the same reason as its Foreman counterpart: it was the defense to the charged false pretense.

3. **"Not a penny": the destination of the $305,000.** Three times — on direct, again on direct, and once more on redirect after two days of contrary admissions — the defendant swore that none of the $305,000 went to him personally:

> Q. Did you ever pocket yourself, put in your pocket any of that $305,000?
> A. Not a penny.
> Q. Where did it go?
> A. Living Waters.
> (Tr. 24:13–17; accord Tr. 57:19–23 ("Right into the car wash."); Tr. 237:19–23 ("Put it right back in the car wash. … 100 percent."); Tr. 239:6–8 ("Q. All of the money that you personally received, did all of that money go back into the car wash? A. Every penny.").)

The defendant's own testimony and records refute the claim. Both contractor checks were deposited into his personal account (Tr. 237:24–238:1), deliberately (Tr. 205:17–206:2). From that account he "immediately turned around and wrote checks to … both Pieper brothers" — his concealed personal creditors — overdrawing the account so quickly that he had to move money over from Living Waters to cover the checks. (Tr. 199:11–21.) Of the $200,000 Foreman check, he returned only $125,000 to Living Waters. (Tr. 200:15–17.) On direct examination he admitted where the money went: "The — the loan that I'd taken out personally from family, those funds were repaid, and, well, my credit cards that I used so all of my personal sources of funding." (Tr. 31:8–12.) Repaying one's own family loans and personal credit cards is pocketing the money. His own summary exhibits documented only about $65,000 in out-of-pocket car-wash spending (Tr. 48:25 ($10,024.44); 49:24 ($5,580.93); 52:17 ($13,626.33); 53:19 ($35,483)), and his PSR objection puts the figure at "roughly $100,000" (Filing No. 139, § II.A) — either way, a fraction

of the $305,000 he collected while spending $33,000 in May 2021 against $8,000 to $10,000 in monthly income (Tr. 206:12–20) and buying silver bullion that October (Tr. 202:1–8). Whether the defendant personally profited went directly to his intent to defraud; the falsehood was material. And its repetition on redirect — after the cross-examination admissions — removes any possibility of confusion. That is not faulty memory; it is insistence.

**4. The "honest mistake" account of the concealed debts.** The defendant testified that his omission of the family debts from the Stearns Bank submissions was innocent: "It was an honest mistake and I really wish I would have added it" (Tr. 42:16–25); "[i]t was — it was truly an oversight. It was an honest mistake" (Tr. 188:14–17); "It was an omission" (Tr. 235:9–12). The claim cannot be reconciled with his own admissions:

> Q. And that debt schedule did not include the $200,000 that you owed to Merle Pieper and your father-in-law, Mr. Jerome Pieper?
> A. You are correct.
> Q. You didn't forget about those loans; right?
> A. No.
> Q. You told them wait till I get the loan money so I can pay you back; right?
> A. That was what I shared in December, yes.
> (Tr. 185:12–22.)

The Pieper loans, in other words, were deliberately omitted — and then paid with the loan-funded kickbacks, exactly as promised. (Tr. 199:11–15.) As for the $150,000 Brouillette note — which the defendant signed in Living Waters' own name (Tr. 186:5–8) — he wrote Ms. Brouillette a check on March 30, 2021, days before the debt schedule and in the same week he was emailing Stearns' banker. (Tr. 186:9–12; 188:12–17; Gov. Exs. 26, 114.) The note itself, maturing within a week, was saved on March 27, 2021 in a desktop folder called "final invoices," alongside Foreman's real $368,000 invoice — the one the defendant then had increased by $200,000. (Tr. 193:10–22.) In total the defendant omitted "about half a million dollars" in debt (Tr. 190:21–23) — while serving as a bank CFO and accountant who told the jury he "love[s] numbers" and is

8

"really good at Excel" (Tr. 190:24–191:12). The defendant conceded the effect of the omissions: Stearns Bank "didn't have the right information to assess [his] financial strength" (Tr. 188:18–20), and its April proposal issued "based on misrepresented information" (Tr. 188:21–23). The omissions are charged conduct in Count I; their characterization as accident was material, false, and willful. A witness does not "forget" a debt he is simultaneously paying, scheduling for repayment from the loan proceeds, and filing in the same place he keeps all final invoices.

**5. The denial of the DuBray/Heritage Equity arrangement.** On direct, the defendant flatly denied the arrangement at the center of the Government's concealment evidence: "Q. Okay. You heard testimony about Heritage Equity having a[n] interest in Living Waters? A. Yes. Q. Is that true? A. False." (Tr. 65:3–7.) On cross, he denied that Heritage Equity was a 40 percent owner or that DuBray — Bank of the Valley's Chief Operating Officer and the loan officer for the Living Waters loans — held half of that interest (Tr. 200:4–8); he testified that "Legacy Trust never existed … [i]t didn't have a tax return or a bank account" (Tr. 182:13–16); he called DuBray's $40,000 personal check "unrelated" to any interest in Living Waters (Tr. 211:22–25); and he described the entire structure as accident — "[t]here was no intent" (Tr. 184:1–3), "[i]n error" (Tr. 183:8–10).

His own contemporaneous documents chart a deliberate, month-by-month sequence. On November 16, 2020, he emailed Fichter proposing a restructuring worth a "$195,000 benefit to Jerry" Pieper. (Tr. 172:22–25; Gov. Ex. 179.) Fichter refused. Two days later, on November 18, 2020, the defendant and DuBray signed the Heritage Equity operating agreement. (Tr. 174:14–16; Gov. Exs. 35, 182.) On December 7, 2020, the defendant obtained an EIN for "Legacy Trust" (Tr. 181:7–12), and on December 7–8 he instructed counsel that his equity in both Living Waters and Shine Express was "supposed to flow through" Legacy Trust I (Tr. 179:7–10; Gov. Ex. 173). In

9

May 2021, he delivered the Heritage Equity and Legacy Trust EINs to his tax preparer (Tr. 181:13–25; Gov. Ex. 170), and the resulting 2020 return reported Heritage Equity as a 40 percent owner of Living Waters — producing what the defendant agreed was "a huge tax break" for himself and for DuBray (Tr. 183:8–14), refunds reaching back years (Tr. 184:13–19), and a benefit DuBray had to repay — approximately $150,000 to $180,000, plus capital-gains consequences — once the returns were unwound (Tr. 184:9–12; 212:1–7). The defendant withheld from Fichter the very page of the Living Waters return showing Heritage Equity's 40 percent interest (Tr. 220:5–14), and the "error" was corrected only after the bank terminated him (Tr. 183:15–18).

The Court need not resolve which entity "really" held the 40 percent interest to rule on this enhancement. What the Court can and should find is that the defendant's sworn description of this documented sequence — EIN by EIN, email by email, signature by signature — as accident and error was false and willfully so. The concealed routing of benefits to another bank executive and the defendant's own lending officer went to the heart of the charged concealment and of the defendant's intent; the testimony was material under Application Note 6.

## C. The Enhancement Should Be Sustained, and No Acceptance Reduction Is Available

Each of the five statements independently satisfies *Dunnigan*: each was false by a preponderance of the evidence — established by documents and admissions, not merely by the jury's verdict, *see Gomez*, 165 F.3d at 654; each was material, because each, "if believed, would tend to influence or affect" the central issue of fraudulent intent, USSG § 3C1.1, cmt. n.6; and each was willful, marked by invented detail, internal contradiction, and repetition rather than confusion, mistake, or faulty memory. These findings do not penalize the defendant for exercising his right to testify; that right "does not include a right to commit perjury." *Dunnigan*, 507 U.S. at 96 (citing *Nix v. Whiteside*, 475 U.S. 157, 173 (1986)). The two-level enhancement (PSR ¶¶ 51, 61) should

be sustained. The same conduct confirms that the defendant — who put the Government to its proof, contested the factual elements of guilt, and continues to describe the offense as a series of "honest mistakes" (Tr. 241:10–11) — is not entitled to any reduction for acceptance of responsibility. See USSG § 3E1.1, cmt. nn.2, 4.

### IV. THE SECTION 3553(a) FACTORS SUPPORT A GUIDELINES SENTENCE

Once the range is correctly calculated, the Court weighs the 18 U.S.C. § 3553(a) factors to arrive at a sentence "sufficient, but not greater than necessary" to serve the statute's purposes. A sentence within a properly calculated range may be presumed reasonable on review. *Rita v. United States*, 551 U.S. 338, 348 (2007); *Feemster*, 572 F.3d at 461. Here, every factor points to a sentence within the advisory range, and none supports a variance below it.

### A. The Nature and Circumstances of the Offense — § 3553(a)(1)

This was not an impulsive crime; it was an engineered one, executed in writing, over more than a year, by the one person in the transaction trained and paid to detect it. The defendant worked the fraud from both sides of the lending relationship: as borrower, he supplied the false inputs; as CFO of the lender, he understood precisely which inputs mattered. He knew the loan-to-value ratio was the gate, and he built the value to fit — conceding at trial that the appraisal "allowed the bank to lend more dollars" (Tr. 160:18–23), and telling Stearns Bank's loan officer in writing that adding the Foreman and Langer final invoices to the appraised value produced an 81 percent loan-to-value ratio (Tr. 194:2–9). The two invoices at the center of that arithmetic were, by his own admission, false: $200,000 that Foreman "did not earn" (Tr. 192:9–14) and $105,000 that "was not for work that Mr. Langer completed" (Tr. 195:1–11), submitted to the bank with full knowledge (Tr. 196:25–197:4; 209:8–10).

11

The money then made its round trip: from Bank of the Valley, through Living Waters, through the contractors' accounts, and back to the defendant's personal account — $105,000 from Langer on May 19, 2021, and $200,000 from Foreman on June 22, 2021 — where it retired the family debts and personal credit cards he had concealed from Stearns Bank. (Filing No. 141, § IV.C; Tr. 31:8–12; 199:11–21.) Bank of the Valley ultimately advanced $420,000 more than the project's final construction cost — a figure the defendant himself volunteered at trial. (Tr. 161:18–24.) And throughout, the defendant concealed the interest he had arranged for the bank's COO— the loan officer on the Living Waters loans — a conflict that, had it been disclosed, would have ended the lending relationship on the spot. (Filing No. 141, § II.C; *supra* Part III.B.5.)

The defendant's refrain — that the banks were repaid and "lost nothing" — mistakes fortuity for innocence. The loans were repaid because the fraud stayed hidden long enough for the business to survive and refinance; in the meantime, the defrauded lenders held loans that were riskier and less valuable than they had been told, which is precisely the harm the Eighth Circuit's intended-loss cases measure. (Filing No. 141, § II (discussing *Kok*, *Carter*, and *Miller*).) As for Stearns Bank, it "lost nothing" only because the attempt ended when Stearns asked the defendant for a $10,000 due-diligence deposit and he declined to pay it. (Tr. 151:9–10.) An attempt that fails is not mitigation; it is Count I.

**B. The History and Characteristics of the Defendant — § 3553(a)(1)**

The defendant comes before the Court with genuine advantages: no criminal history (PSR ¶ 68), an MBA in accounting, two decades of steady employment in finance, a supportive wife and three young children, and a record of community involvement. The Government does not begrudge him any of it. But at sentencing for this offense, these characteristics cut in both directions, because they are the currency the fraud spent. Community banks lend on trust in precisely this résumé —

the credentialed, upstanding, hardworking bank officer — and the defendant leveraged every line of it. Nor was this a crime of desperation. The defendant had a $132,500 salary (Tr. 9:23), a home, and options; what he wanted was to capture lucrative tax benefits — by his own admission, he borrowed family money without telling his lender so that the car wash could be completed in time to "realize that tax benefit." (Tr. 184:22–185:1.)

His zero-point criminal history is already fully priced into the advisory range — that is what criminal history category I is — and his family circumstances, while sympathetic, are "not ordinarily relevant" to whether a sentence should fall below it. The hardship that incarceration visits on a defendant's young family is, regrettably, the ordinary consequence of serious federal crime; it is not a reason to spare the defendant who had the most advantages and the least excuse.

## C. Seriousness of the Offense, Respect for Law, and Just Punishment — § 3553(a)(2)(A)

Community banking runs on trust — depositors' trust in the institution, the institution's trust in its officers, and the regulator's trust in both. A chief financial officer who defrauds his own bank corrodes all three at once. Congress fixed the seriousness of the offense at a 30-year statutory maximum per count; the Guidelines grade it by the amount of credit put at risk. The defendant then compounded the offense in this courtroom: he answered the indictment by lying to the jury, and he answers the Presentence Report by describing a year of engineered deception as "some honest mistakes" (Tr. 241:10–11) — indeed, by maintaining that beyond documentation he "never did anything wrong" (Tr. 12:6–7). A sentence below the properly calculated range would tell every future insider that the price of fraud is denial, and that the discount survives even perjury. Just punishment requires the sentence to answer both the fraud and the lies told to excuse it.

13

## D. Adequate Deterrence — § 3553(a)(2)(B)

General deterrence carries particular weight in white-collar cases. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (cleaned up) — a case that, fittingly, involved a chief financial officer. The audience for this sentence is small, financially literate, and paying attention: bank officers and insiders who know exactly what an 80 percent loan-to-value covenant requires, exactly how an appraisal input moves a credit decision, and exactly how visible — or invisible — an insider's self-dealing is to a small bank's board. The defendant's conduct was a bet that the numbers would never be checked; the sentence should make clear that the bet fails even when the car wash succeeds. Deterrence also reaches the obstruction: defendants deciding whether to testify falsely should know that perjury has a price the Guidelines actually collect.

## E. Protection of the Public — § 3553(a)(2)(C)

The defendant's instruments were a signature block, a spreadsheet, and insider access — tools he will seek again, because finance is his trade. Federal law will likely bar him from the affairs of insured depository institutions, see 12 U.S.C. § 1829, and the Court should reinforce that bar with supervised-release conditions requiring full financial disclosure and restricting new credit. His continued minimization — "honest mistakes," no wrongdoing beyond documentation — bears directly on the risk calculus: a defendant who does not believe he defrauded anyone has no reason not to do it again.

## F. Avoiding Unwarranted Disparities — § 3553(a)(6)

The Guidelines are the system's principal instrument for national uniformity, and a within-range sentence is what keeps this defendant's punishment in line with that of similarly situated

14

insiders convicted after trial. The disparity to avoid here is the one the defense proposes: a total offense level of 5 — zero to six months — for a bank CFO convicted by a jury of a multi-million-dollar fraud with obstruction, while ordinary defendants who plead guilty to smaller, simpler frauds and accept responsibility serve years. Leniency of that order would not avoid disparity; it would manufacture it.

## V. THE DEFENDANT'S REQUEST FOR A DOWNWARD VARIANCE SHOULD BE DENIED

The defendant asks the Court to vary downward even from the PSR's 70-to-87-month range, resting on his zero-loss theory, his history and family circumstances, the collateral consequences of felony conviction, and the absence of restitution requests. None of these grounds, alone or together, supports a below-range sentence.

**"Zero loss."** The loss dispute is a Guidelines question. As a variance argument it fails twice over. First, its premise confuses outcome with intent: repayment occurred because the scheme stayed concealed long enough for the business to survive and refinance — in the interim, the banks held loans materially riskier than the ones they thought they had made, and Bank of the Valley had advanced $420,000 more than the project cost to build (Tr. 161:18–24). Second, the defense's own best fact refutes its conclusion. The defendant points to NBC Bank, which refinanced the debt knowing of the family loans and the investigation — but, as the defendant concedes, NBC "balanced the risk by obtaining more collateral from the borrowers." (Filing No. 146, PageID 1430.) That is the whole point: truth changes the terms. The difference between the deal a lie procures and the deal the truth commands is exactly what the defendant took from his lenders, and exactly what the Guidelines price as intended loss.

**The "success story."** The defense casts the case as "a success story about an entrepreneur" in which the fraud "played a very small role." (Filing No. 139, § II.A.) The Government does not

15

dispute the hours — the defendant worked on the car wash "[e]xhaustively" (Tr. 153:7–8) — but hard work is not a defense the jury accepted, and it is not mitigation now. A borrower does not earn a fraud discount because the collateral he improved with the victim's own advances turned out well.

**Family circumstances and personal history.** The defendant's family circumstances are not exceptional enough to warrant special relief.  The record shows a supportive spouse, three young children, steady employment, and civic involvement, none of which are atypical enough to warrant a variance.

**Collateral consequences.** The defendant invokes *United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016), for the weight of a felony conviction's collateral consequences. (Def. Sent. Br., § V.) *Nesbeth* is neither controlling nor persuasive here. Unlike the facts at issue here, *Nesbeth* did not involve a defendant in a position of trust who abused their position and knowledge to orchestrate a sophisticated bank fraud scheme. The consequences the defendant identifies — felon status, employment barriers, the statutory bar of 12 U.S.C. § 1829 — are the ordinary, intended incidents of a federal fraud conviction, shared by every bank insider convicted of bank fraud. Treating them as variance grounds would build a systematic discount into white-collar sentencing for the professionals who had the most to lose precisely because they had been trusted with the most. It is precisely what the *Nesbeth* court did not do when it considered the appropriate sentence for a defendant whose role in the offense was limited in scope and duration.

**Recidivism statistics, bond compliance, and zero-point status.** Category I already reflects the defendant's lack of record, and his age-based recidivism argument proves no more than the Guidelines assume. Compliance on a personal-recognizance bond is expected of every defendant, not a credit. And the zero-point-offender adjustment is unavailable by its terms, because

16

the defendant organized and led others involved in the scheme. USSG § 4C1.1(a)(10); (PSR ¶ 48) Against all of this stands the record that bears on the defendant's future conduct: minimization sustained from his first interview through his last answer on redirect.

**Restitution.** No identified victim has requested restitution, and consistent with the PSR the Government seeks none. But the absence of a restitution claim reflects that the fraud was detected before it collapsed — not that it was benign — and it is no basis for a variance.

## VI. CONCLUSION

For the foregoing reasons, and those to be articulated at the sentencing hearing, the United States respectfully requests that the Court: (1) resolve the Guidelines objections as previously set forth and sustain the PSR's obstruction enhancement on the findings as proposed; (2) impose a sentence of imprisonment within the resulting advisory Guidelines range — 168 to 210 months on the Government's calculation, and in any event, within the range the Court adopts; (3) deny the defendant's motion for a downward variance; and (4) impose a term of supervised release with financial-disclosure and credit-restriction conditions, together with the mandatory special assessment of $100 on each count.

DATED this 6th day of July 2026.

UNITED STATES OF AMERICA, Plaintiff

LESLEY A. WOODS,
United States Attorney
District of Nebraska

By:    s/ Alejandro Abreu

Alejandro Abreu, OH Bar #0089477
Special Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE  68102-1506
Tel: (213) 828-0023

17

E-mail:  alejandro.abreu@usdoj.gov

s/ Sarah A. Hinrichs

SARAH A. HINRICHS, #24335
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE  68102-1506
Tel: (402) 661-3700
Fax: (402) 661-3084
E-mail:  Sarah.Hinrichs@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all registered participants.  I also hereby certify that a copy of the same was served by regular mail, postage prepaid, to the following non-CM/ECF participants:  None.

s /Alejandro Abreu

Special Assistant U.S. Attorney

18