IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

AARON T. LUNEKE,

Defendant.

8:24-CR-124

TENTATIVE FINDINGS REGARDING THE PARTIES' OBJECTIONS TO THE REVISED PRESENTENCE INVESTIGATION REPORT

On March 6, 2026, following an eight-day trial, a jury found defendant Aaron T. Luneke guilty of one count of attempted bank fraud (Count I) and one count of bank fraud (Count II), both in violation of 18 U.S.C. § 1344. Filing 128; Filing 1. Luneke's sentencing hearing is scheduled for July 13, 2026, at 9:00 a.m. Filing 148 (Text Minute Entry). A Revised Presentence Investigation Report (Revised PSR) has been prepared in anticipation of sentencing, and both Luneke and the Government have objected to various portions of the Revised PSR. Filing 139 (Statement of Defendant Pursuant to NECrimR 32.1(B)(6)(c) Regarding Sentencing Procedures); Filing 141 (Government's Position Regarding Unresolved Objections to Revised PSR); Filing 146 (Defendant's Response to Government's Position Regarding Unresolved Objections to Revised PSR). As is the Court's practice, the Court will address the parties' objections during the sentencing hearing before pronouncing the sentence in this case. However, due to the amount and nature of those objections, the Court issues these tentative findings prior to sentencing. Although the Court's tentative findings address issues related to the United States Sentencing Guidelines, the Court notes

1

that, pursuant to *United States v. Booker*, 543 U.S. 220 (2005), those Guidelines are advisory. Luneke has also filed a Motion for Downward Variance, Filing 137, and supporting documents. *See* Filing 138 (Sentencing Brief in Support of Motion for Downward Variance); Filing 140 (Sentencing Exhibit List); Filing 140-1 (Sentencing Exhibits). The Court will consider the parties' arguments regarding the appropriateness of a variance during the sentencing hearing, and these tentative findings have no bearing on the issue of a variance.

## I.   BACKGROUND

Given the fact-specific nature of the parties' objections, the Court begins with a brief overview of the facts of this case.

### A.   The Car Wash

Defendant Aaron T. Luneke was the Chief Financial Officer of Bank of the Valley when in 2020 he and his business partner, Nathan Fichter, decided to build a car wash in Columbus, Nebraska. Luneke and Fichter are partners in Living Waters RE, LLC (Living Waters), a real estate holding company. Fichter holds a 60% stake in Living Waters, while Luneke's ownership is 40%. The car wash itself is called Legacy Express Wash, and it is operated by a separate company, Shine Express Wash, LLC (Shine Express). Fichter, Luneke, and Jerome Pieper (Luneke's father-in-law) are members of Shine Express.

### B.   The Construction Loan from Bank of the Valley

In February of 2020, Living Waters obtained a $2.1 million construction loan from Bank of the Valley to begin construction of the car wash on a plot of land that was purchased in part with a $150,000 loan from Fichter's mother-in-law, Patricia Brouillette (the Brouillette loan). Luneke did not disclose the Brouillette loan to Bank of the Valley in the construction loan application. John Dubray, a Bank of the Valley executive, was Luneke's loan officer for the Living Waters loan.

2

### C. Constructing the Car Wash

Craig Foreman of Foreman Lumber was the general contractor for the construction of the car wash, and Christopher Langer of Langer Electric performed the electrical work. Luneke also heavily participated in the construction of the car wash. As the construction progressed, the costs associated with the project increased and Living Waters sought additional financing from Bank of the Valley. Luneke and Fichter also both contributed additional funds to the project, with Luneke borrowing $200,000 from family members for construction costs and accumulating nearly $100,000 in credit card debt. Construction was completed and the car wash was operational by December 31, 2020. Following the completion of the car wash, Luneke asked both Foreman and Langer to submit final invoices for more than the contractors were owed. Langer testified that Luneke asked him to submit an invoice for $150,000 when Langer was only owed $45,000. Living Waters paid Langer Electric the $150,000 charged in the invoice and then Langer, at Luneke's direction, wrote a check directly to Luneke for $105,000 of that money. Foreman testified that Luneke asked him to submit an invoice charging $200,950 more than the actual amount owed to Foreman. Living Waters paid Foreman Lumber the total amount billed—more than $569,000—and then Foreman, at Luneke's direction, wrote a check directly to Luneke for $200,950. In total, Luneke received $305,950 from the "inflated" invoices.

### D. Refinancing the Construction Loan

In the spring of 2021 Luneke and Fichter sought to refinance their Bank of the Valley construction loan as a long-term loan guaranteed by the Small Business Administration (SBA). Luneke, on behalf of Living Waters and Shine Express, initially applied for a $2.7 million SBA loan from Stearns Bank. Luneke later sought a larger loan from Stearns Bank—in the amount of $3.5 million—after he informed the bank that the initial appraised value of the car wash did not account

for the final invoices from Langer and Foreman. Luneke did not include either the Brouillette loan or his outstanding debts to family members in the loan application. Stearns Bank offered Luneke a loan for $2.9 million but the discussions fell through, and Stearns Bank ultimately did not issue a loan to Luneke's entities. Luneke was able to refinance the construction loan with Bank of the Valley in May of 2021. This interim financing took the form of two loans totaling $4.32 million and served as a short-term solution until the loans could be refinanced by a different financial institution. Like the loan application submitted to Stearns Bank, the loan application used to achieve interim financing from Bank of the Valley did not fully disclose outstanding debts and the appraisal underlying the application included the inflated invoices.

### E. Bank of the Valley's Investigation

Bank of the Valley employees eventually grew suspicious and began an internal investigation of Living Waters's $4.32 million loan. During that internal investigation, Bank of the Valley personnel reviewed Living Waters' 2020 tax return, which listed "Heritage Equity" as owning 40% of Living Waters instead of Luneke. Living Waters also appeared on Heritage Equity's 2020 tax return as an investment. Luneke testified at trial that Heritage Equity was an entity he created "to be able to own things" and to pursue business ventures, such as the construction of a car wash in Norfolk, Nebraska (which did not ultimately come to fruition). Filing 145 at 62. According to Heritage Equity's operating agreement, the entity's owners were Luneke, his wife, and Dubray. Because of its purported ownership of Living Waters, Heritage Equity received a depreciation benefit in its 2020 taxes and Luneke and Dubray received substantial tax breaks. Confronted with this discrepancy at trial, Luneke testified that Heritage Equity was listed on Living Waters's tax return "[i]n error" and that the issue was eventually corrected, requiring Dubray to repay the money he had received. Filing 145 at 183–184, 220–221. Another entity, "Legacy Trust I," also came to

Bank of the Valley's attention during the investigation. Luneke testified that he "initially . . . wanted to have [his] interest" in Living Waters held "in a trust" (Legacy Trust I) but the trust "never existed . . . as an [Employer Identification Number]" and did not hold his interest in Living Waters or have a tax return or bank account. Filing 145 at 182, 230.

### F.  The Loan's Current Status

Bank of the Valley fired Luneke and Dubray in May 2022 and placed Living Waters' $4.32 million loan in default, resulting in an interest rate of 16%. Ultimately, Nebraska Bank of Commerce (NBC) purchased Living Waters' loan from Bank of the Valley, though Fichter had to pledge additional collateral to secure the loan. Living Waters continues to make monthly payments to NBC, and there have been no defaults to date.

## II.  THE PARTIES' OBJECTIONS

The Revised PSR uses the 2025 United States Sentencing Commission Guidelines Manual to calculate Luneke's sentencing guidelines. Pursuant to U.S.S.G. § 3D1.2(d), Counts I and II are grouped. The Revised PSR assigns Luneke a Base Offense Level of 7 under U.S.S.G. § 2B1.1(a)(1). As set forth in the Revised PSR, Luneke's Adjusted Offense Level is 27 due to the imposition of five sentencing enhancements. The Revised PSR does not adjust Luneke's offense level under Chapter Four of the Guidelines or under U.S.S.G. § 3E1.1, so his Total Offense Level remains 27. The Revised PSR computes Luneke's total criminal history score to be zero, resulting in a Criminal History Category of I. Taken together, a Total Offense Level of 27 and a Criminal History Category of I produce a guideline custody range of 70 to 87 months.

Both Luneke and the Government object to the Revised PSR's guideline calculations but neither party challenges the conclusion that Luneke's Base Offense Level is 7 or that his Criminal History Category is I. Luneke, for his part, contends that he should not be subject to any of the

sentencing enhancements applied in the Revised PSR. Filing 139 at 28–29. Luneke argues that without any enhancements, his Adjusted Offense Level should remain 7, and he further asserts that he should be entitled to a Chapter Four adjustment under U.S.S.G. § 4C1.1 for being a zero-point offender. Filing 139 at 29. Luneke's calculations result in a Total Offense Level of 5 which, alongside a Criminal History Category of I, produces a guideline custody range of 0 to 6 months. The Government, on the other hand, argues that Luneke should be subject to greater sentencing enhancements than those included in the Revised PSR. Filing 141 at 1–2. The Government's calculations result in an Adjusted Offense Level of 37. Without any Chapter Four adjustments or a reduction pursuant to U.S.S.G. § 3E1.1, the Total Offense Level pursuant to the Government's calculations remains 37. A Total Offense Level of 37 and a Criminal History Category of I produce a guideline custody range of 210 to 262 months.[1]

The Court will address the parties' objections below and provide the parties with its anticipated position on each objection. Although this order sets forth the Court's likely rulings on the parties' objections, the Court will reserve its final rulings on the objections until the sentencing hearing, where the parties will have the opportunity to make further argument. The Court issues these tentative findings in the interest of conserving the Court's and the parties' time and resources at the sentencing hearing.

---

[1] In its Position Regarding Unresolved Objections to Revised PSR, the Government "preserves" its second objection—the objection to the non-application of the two-level "substantial-financial-hardship enhancement" under U.S.S.G. § 2B1.1(b)(2)(A)(iii)—and does not appear to include that enhancement in its guideline calculations. Filing 141 at 2 ("The combined effect of sustaining the first and third objections is to increase the total offense level from 27 to 35, yielding an advisory range of 168-210 months at criminal history category I."). However, the Government later explicitly asks the Court to apply that two-level enhancement "for the substantial financial hardship sustained by Mr. Fichter based on his testimony and statements to the Probation Office," so the Court has factored in that enhancement in relaying the Government's proposed guideline custody range. Filing 141 at 11.

6

### III. ANALYSIS

#### A. Applicable Standards

All of the objections to the Revised PSR challenge the application (or non-application) of sentencing enhancements.[2] "The burden rests with the government to prove by a preponderance of the evidence each of the facts necessary to establish a sentencing enhancement." *United States v. Coffer*, 154 F.4th 965, 968 (8th Cir. 2025). In evaluating whether the Government has met that burden and in making sentencing determinations, the Court "may rely on evidence introduced at trial." *United States v. Garcia*, 703 F.3d 471, 475 (8th Cir. 2013). As the Eighth Circuit Court of Appeals has explained, "[i]n cases where the district court also presided over the trial, the court may rely on evidence submitted at trial, during the sentencing hearing, and on uncontested statements from the defendant's presentence report." *United States v. Maluoth*, 121 F.4th 1158, 1164–65 (8th Cir. 2024) (alteration in original) (internal quotation marks and citation omitted). Here, the Court presided over the eight-day trial of Luneke and will rely on the evidence from trial in making its tentative rulings on the parties' objections to the Revised PSR.

#### B. The Parties' Objections to the Loss Enhancement

The Court begins with the parties' objections to the twelve-level enhancement applied pursuant to U.S.S.G. § 2B1.1(b)(1)(G) and reflected in paragraphs 44 and 56 of the Revised PSR. Filing 139 at 29; Filing 141 at 1–2. "Under the Sentencing Guidelines, the offense level for fraud offenses increases based on the amount of loss." *United States v. Miller*, 588 F.3d 560, 565 (8th Cir. 2009) (citing U.S.S.G. § 2B1.1(b)). The relevant guideline defines "loss" as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, Notes to Table (A). The parties agree that there was no

---

[2] Luneke's objection to the non-application of the zero-point offender adjustment is a Chapter 4 objection but as the Court explains in Section III.E., that adjustment is contingent upon the sentencing enhancements that do or do not apply to Luneke.

actual loss in this case, so the Court is tasked with calculating intended loss. Intended loss "(I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1, Notes to Table (C)(ii).

The Revised PSR, Luneke, and the Government each advocate for a different method for calculating intended loss. The Revised PSR's position is that a twelve-level enhancement should apply because the loss caused by Luneke's offense is "[m]ore than $250,000" but less than $550,000. U.S.S.G. § 2B1.1(b)(1)(G)–(H). Specifically, the Revised PSR sets the loss amount at $305,950 based on the "two inflated construction invoices . . . that were submitted to Bank of the Valley when applying for a $4,320,000 business loan." Revised PSR at 10 (¶ 44), 12 (¶ 56). Luneke argues that the Revised PSR is "spot on in the first step of [the] calculation of intended loss" but that there are "two mitigating factors"—"intent and collateral"—that the Revised PSR "failed to take into account" and that result in an intended loss of "zero." Filing 139 at 2–3. The Government, on the other hand, contends that Luneke should receive an eighteen-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J) because the loss amount is "[m]ore than $3,500,000." Filing 141 at 6. The Government argues that the loss amount is $7,820,000—the sum of the $3.5 million loan Luneke sought from Stearns Bank in 2021 and the $4.32 million loan Luneke obtained from Bank of the Valley in 2021—because "intended loss in a fraudulent loan application case is the difference between the amount of credit the lender extended on the false representations and the amount it would have extended on truthful inputs" and here "neither bank would have made the loans if they were provided the truth." Filing 141 at 1–2.

The Court "need only reasonably estimat[e] the loss using a preponderance of the evidence standard," *United States v. Suhl*, 885 F.3d 1106, 1117 (8th Cir. 2018) (alteration in the original) (internal quotation marks and citation omitted), and "the loss need not be determined with precision," *United States v. Miell*, 661 F.3d 995, 1000 (8th Cir 2011) (internal quotation marks and citation omitted)). Having reviewed the law and the parties' arguments, the Court determines that the Revised PSR's approach to the loss calculation is reasonable but that the calculated amount falls short of the loss in this case because it does not include the loss Luneke intended Stearns Bank.

In fraudulent loan cases, "the amount by which [the defendant] caused the loans to be overfunded" is "a good measure of the lenders' losses" because even when fraudulently obtained loans have not defaulted, "lenders have still suffered a loss, since they have been left with riskier, hence less valuable loans than they meant to contract." *United States v. Carter*, 412 F.3d 864, 869 (8th Cir. 2005). Accordingly, in cases like this one where the defendant obtained a loan by submitting fraudulent documentation to a lender, "the measure of the loss that [the defendant] intended to inflict is the difference between the amount of credit the bank extended based on the false representation and the amount of credit the bank would have extended had it known the company's true financial condition." *Id.* at 896–70 (quoting *Kok v. United States*, 17 F.3d 247, 250 (8th Cir. 1994)). In other words, the "formula" for "calculations of *intended* loss" in fraudulent loan cases is "the difference between what the bank would have lent [the defendant's company] without inflated collateral and what it actually lent." *United States v. Rubashkin*, 655 F.3d 849, 868 (8th Cir. 2011) (emphasis in the original); *see also Miller*, 588 F.3d at 566 ("[T]he amount of intended loss attributable to Miller is the amount by which the fraudulent loans purchased by the financial institutions exceeded the amount that those institutions would have paid had they known the truth.").

9

Here, Luneke qualified for a $2.9 million loan[3] from Stearns Bank and ultimately obtained a $4.32 million loan from Bank of the Valley. In his discussions with the banks, Luneke justified the loan amounts using an appraisal of the car wash that was based on the inflated invoices submitted by Foreman and Langer. Together, the invoices were inflated by $305,950, meaning the banks either offered or issued loans for a car wash that was worth $305,950 less than the banks realized and meaning that the loans were each "overfunded" by $305,950. *Carter*, 412 F.3d at 869. In other words, for each bank "the difference between what the bank would have lent" Living Waters "without the inflated collateral" and what the bank actually offered or lent Living Waters was $305,950— or $611,900 in total. *Rubashkin*, 655 F.3d at 868. Although the Court acknowledges this is not a perfect calculation of the intended loss, the Court concludes this amount is a "reasonabl[e] estimat[ion]" given the information and evidence available to this Court. *Suhl*, 885 F.3d at 1117. Under U.S.S.G. § 2B1.1(b)(1), an intended loss amount of $611,900 results in a fourteen-level increase to Luneke's offense level. U.S.S.G. § 2B1.1(b)(1)(H) (directing courts to "add 14" if the loss is "[m]ore than $555,000").

Luneke argues that "intent and collateral" are "two key mitigating elements" in the intended loss calculation, and he specifically contends that the value of the car wash itself should be credited against the loss amount. Filing 139 at 2, 11. The Court acknowledges that "[i]n determining intended loss, courts examine a defendant's subjective intent," *Miell*, 661 F.3d at 1001, and that "collateral is relevant to determining intent," *United States v. Staples*, 410 F.3d at 491 (8th Cir. 2005). *See also* U.S.S.G. § 2B1.1 comment. n.3(D)(ii). In this case, however, the Court does not believe that "the

---

[3] Luneke actually sought a $3.5 million loan from Stearns Bank, but Stearns Bank was only willing to lend Living Waters $2.9 million based on the loan application. Both Luneke's requested loan amount and Stearns Bank's offered loan amount were based on the same inflated appraisal.

facts warrant" subtracting "the value of the collateral from the intended loss amount" because doing so would run counter to the aims of justice and would effectively communicate to defendants that they can commit fraud so long as they use that fraud to create a successful business. *Staples*, 410 F.3d at 491. The Court's loss calculation must be "reasonable," *Miell*, 661 F.3d at 1000, and the Court finds it altogether unreasonable to reward Luneke for causing or attempting to cause "the financial institutions he defrauded" to "t[ake] on more risk than was represented to them." *Miller*, 588 F.3d at 566. Accordingly, the Court "decline[s] to accept [Luneke's] invitation to calculate intended losses based upon [his] succeeding with his fraud and deception." *United States v. Piggie*, 303 F.3d 923, 927 (8th Cir. 2002).

For these reasons, the Court concludes that intended loss was $611,900 and that a fourteen-level enhancement under U.S.S.G. § 2B1.1(b)(1)(H) will be imposed. Both Luneke's and the Government's objections are therefore tentatively overruled.

### C. Luneke's Remaining Objections

Luneke has five remaining objections, four of which relate to sentencing enhancements that have been applied in the Revised PSR. The Court will address each of those enhancement objections below. Luneke's final objection is to the non-application of a zero-point offender adjustment pursuant to U.S.S.G. § 4C1.1. Luneke's eligibility for the zero-point offender adjustment depends in part on the enhancements that apply to him. Because both Luneke and the Government have raised enhancement objections that would impact his zero-point offender eligibility, the Court will address that final objection after it has tentatively ruled on the parties' enhancement objections.

#### 1. The "Sophisticated Means" Enhancement

Luneke objects to the two-level enhancement for "engag[ing] in a pattern of conduct that consisted of sophisticated means." Revised PSR at 10 (¶ 45), 12 (¶ 57). Pursuant to U.S.S.G. §

2B1.1(b)(10)(C), a two-level enhancement applies if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." "The Sentencing Guidelines define 'sophisticated means' as 'especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.'" *United States v. Sorensen*, 148 F.4th 992, 998 (8th Cir. 2025) (quoting U.S.S.G. § 2B1.1, comment. n.9(B)). The sophisticated means "'enhancement is proper when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense' and [ ] repetitive and coordinated conduct can amount to a sophisticated scheme even though no one step in it is particularly complicated." *United States v. Weatherspoon*, 174 F.4th 592, 594 (8th Cir. 2026) (quoting *United States v. Meadows*, 866 F.3d 913, 917 (8th Cir. 2017)). "Note 9(B) expressly provides that 'hiding . . . transactions . . . through the use of fictitious entities [or] corporate shells . . . ordinarily indicates sophisticated means." *Sorensen*, 148 F.4th at 998 (ellipses and alteration in the original) (quoting *United States v. Septon*, 557 F.3d 934, 937 (8th Cir. 2009)).

The Revised PSR applies the sophisticated means enhancement on the basis that Luneke "used multiple shell entities to conceal his ownership when applying for multiple business loans." Revised PSR at 10 (¶ 45), 12 (¶ 57). The Court is inclined to agree with the Revised PSR, although for a slightly different reason. At trial, the Government presented evidence that two different entities—Heritage Equity and Legacy Trust I—held ownership interests in Living Waters, even though neither entity appeared in any of the loan documents nor were otherwise disclosed to the lenders. Evidence of Heritage Equity's ownership, specifically, came from the 2020 tax returns for both Heritage Equity and Living Waters. Luneke contested the existence of Legacy Trust I altogether, and he testified at trial that Heritage Equity was listed as an owner on Living Waters' tax return by mistake. The defense offered evidence of Living Waters' amended tax return, which was

filed after Luneke was fired from Bank of the Valley. There was no evidence, however, that the Heritage Equity tax return was amended to remove its investment in Living Waters, suggesting that it is more likely than not that Luneke at least concealed Heritage Equity's ownership of Living Waters when he applied for loans. This in turn concealed Dubray's ownership of Heritage Equity. The Court believes this trial evidence supports the sophisticated means enhancement and therefore tentatively overrules Luneke's objection.

### 2. The "Abuse of a Position of Trust" Enhancement

Luneke objects to the two-level enhancement pursuant to U.S.S.G. § 3B1.3 for "abus[ing] . . . a position of public or private trust, or us[ing] a special skill, in a manner that significantly facilitated the commission or concealment of the offense." *See* Revised PSR at 9–10 (¶ 46), 12 (¶ 59). "To warrant an abuse-of-trust enhancement, the government must prove by a preponderance of the evidence that, (1) defendant occupied a position of . . . trust, and (2) defendant used this position in a manner that significantly facilitated the commission or concealment of the offense." *United States v. King*, 898 F.3d 797, 810 (8th Cir. 2018) (ellipsis in the original) (internal quotation marks omitted) (quoting *United States v. Walker*, 818 F.3d 416, 423 (8th Cir. 2016)). A position public or private trust is "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)," and "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 comment. n.1. "This adjustment, for example, applies in the case of . . . a bank executive's fraudulent loan scheme." *Id.* Even when the victim "had the ability to inspect" a defendant's work, "the fact that no one did so 'is itself evidence that [the defendant] held a position of trust.'" *United States v. Natysin*, 966 F.3d 738, 739–40 (8th Cir. 2020) (quoting *United States v. Brelsford*, 982 F.2d 269, 272 (8th Cir. 1992)). A position of

trust contributes in "some significant way to facilitating the commission or concealment of the offense" when the position of trust "mak[es] the detection of the offense or the defendant's responsibility for the offense more difficult." U.S.S.G. § 3B1.3 comment. n.1.

The Revised PSR applies the abuse of trust enhancement because Luneke "was responsible, among other things, for overseeing the financial operations and management of Bank of the Valley's investment portfolio" and he "was intimately familiar with bank lending standards, loan-to-value requirements, underwriting criteria, and the documentation financial institutions require before extending credit." *See* Revised PSR at 9–10 (¶ 46), 12 (¶ 59). The Court tentatively concludes that the abuse of trust enhancement is properly applied to Luneke. At the time of the offense, Luneke was the Chief Financial Officer of Bank of the Valley. Although Luneke was not a loan officer or a member of the bank's Board of Directors and therefore did not ultimately approve or issue loans, he was a member of the bank's loan committee, which was tasked with discussing loan applications and reviewing existing loans. Luneke was also personally involved in bringing loans to Bank of the Valley. Based on this evidence from trial, the Court determines that it is more likely than not that Luneke understood what was expected of a loan applicant and what was required for Bank of the Valley to issue a loan. Luneke used this familiarity with Bank of the Valley's lending process to obtain loans that fell short of the bank's standards. Especially considering the size of Living Waters's loans, the fact that Bank of the Valley did not "inspect" and "review" Luneke's applications more thoroughly "is itself evidence that [he] held a position of trust." *Natysin*, 966 F.3d at 739 (internal quotation marks and citation omitted). The Court concludes that Luneke's position as a bank executive—and the knowledge, relationships, and authority that came with it— significantly facilitated the commission and concealment of his offense. The Court therefore tentatively overrules Luneke's objection to the abuse of trust enhancement.

14

### 3. The "Aggravating Role" Enhancement

Luneke objects to the two-level enhancement for being "an organizer, leader, manager or supervisor" in the offense. U.S.S.G. § 3B1.1(c); *see* Revised PSR at 11 (¶ 47), 13 (¶ 60). A defendant only qualifies for this aggravating role enhancement if he was "the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 comment. n.3. The terms "organizer," "leader," "manager," and "supervisor" are "construed broadly." *United States v. De Oliveira*, 623 F.3d 593, 599 (8th Cir. 2010). "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted," U.S.S.G. § 3B1.1 comment. n.1 (emphasis omitted). "The term 'offense' encompasses not only the elements and acts cited in the count of conviction, but also all relevant conduct constituting the 'contours of the underlying scheme itself.'" *United States v. Starks*, 815 F.3d 438, 441 (8th Cir. 2016) (quoting *United States v. Rosnow*, 9 F.3d 728, 730 (8th Cir. 1993)). "And to be 'criminally responsible' under the Guidelines, an individual need only give knowing aid in some part of the criminal enterprise." *United States v. Guzman*, 926 F.3d 991, 1003 (8th Cir. 2019) (internal quotation marks and citation omitted). "[A]n individual need not be guilty of the precise offense of conviction—or even charged—to be found 'criminally responsible' under § 3B1.1." *Id.*; *see also United States v. Keleta*, 949 F.3d 1082, 1093–94 (8th Cir. 2020) (explaining that "[t]o be criminally responsible [for the crime] of conspiring to defraud the United States, a person must have known that an agreement existed to defraud the government and must have knowingly and voluntarily became part of the agreement" (internal quotation marks and citation omitted)).

The Revised PSR states that the aggravating role enhancement is appropriate because Luneke "directed two contractors to inflate construction/electrical invoices as a means to inflate the value and/or worth of the business assets when applying for business loans." Revised PSR at 11 (¶

47), 13 (¶ 60). Construing broadly the terms in U.S.S.G. § 3B1.1(c), the Court has no trouble concluding that Luneke's relationship to Foreman and Langer was that of "an organizer, leader, manager, or supervisor," as Luneke exercised "decision-making authority" and both his "degree of participation in planning or organizing the offense" and his "degree of control and authority" were higher than either contractor. U.S.S.G. § 3B1.1 comment. n.4. The trial evidence further shows by a preponderance of the evidence that Foreman and Langer were "participants" under the Guidelines—meaning they "g[a]ve knowing aid in some part of the criminal enterprise." Guzman, 926 F.3d at 1003 (internal quotation marks and citation omitted).

Langer testified that he was not given a reason for Luneke's request for an inflated invoice, but he also testified to a number of abnormal circumstances surrounding Luneke's request that suggest that Langer more likely than not knew he was aiding Luneke in illegal activity. For instance, Langer testified that he was instructed to handwrite the "kickback" check to Luneke personally, to do so on a blank check that was provided by the bank, and to leave the memo line blank. Langer also testified that Luneke directed him to work with a specific bank teller. Foreman, for his part, testified that he believed Luneke wanted an inflated invoice to overpay Foreman Lumber in order to close out Living Waters's construction loan and cover any incidental billing that showed up later. Although this was not Luneke's exact design, it is still unlawful and demonstrates that Foreman knew he was assisting Luneke in some part of the criminal enterprise. Foreman's admission that he previously committed fraud in a similar context also reinforces the Court's finding that it is more likely than not that Foreman was a participant under the guideline. Both Langer and Foreman knew or should have known that what they were asked to do was certainly not a normal business practice and indeed was illegal. They did it anyway. Accordingly, the Court tentatively overrules Luneke's objection to the aggravating role enhancement.

16

4. *The "Obstruction of Justice" Enhancement*

Finally, Luneke objects to the two-level enhancement for the obstruction of justice. *See* Revised PSR at 11 (¶ 51), 13 (¶ 61). Under U.S.S.G. § 3C1.1, a defendant's offense level is increased by two levels if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and "(2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." The commentary to U.S.S.G. § 3C1.1 sets out a "non-exhaustive list of examples of the types of conduct to which this adjustment applies," including "committing, suborning, or attempting to suborn perjury" and "providing materially false information to a judge or magistrate judge." U.S.S.G. § 3C1.1 comment. n.4(B), (F). "In order to base an obstruction of justice enhancement on a defendant's trial testimony, the district court must find by a preponderance of the evidence that he perjured himself." *United States v. Lewis*, 436 F.3d 939, 945 (8th Cir. 2006). "[A] district court cannot find that a defendant committed perjury simply because a defendant testifies on his own behalf and the jury disbelieves him." *United States v. Thundershield*, 474 F.3d 503, 507 (8th Cir. 2007) (internal quotation marks and citation omitted). "Instead, the district court must find that the defendant gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* (internal quotation marks and citation omitted); *see also United States v. Reed*, 978 F.3d 538, 544 (8th Cir. 2020) ("A defendant is subject to an enhancement under U.S.S.G. § 3C1.1 if he testifies falsely under oath in regard to a material matter and does so willfully rather than out of confusion or mistake." (quoting *United States v. Nichols*, 416 F.3d 811, 821 (8th Cir. 2005))). "If a defendant objects to an obstruction enhancement relying

17

on perjury, the district court must make findings that the defendant willfully gave false testimony concerning materials matters in the case." *Nichols*, 416 F.3d at 821.

The Revised PSR appears to base the obstruction of justice enhancement on Luneke's testimony at trial:

> The defendant testified that he had separately agreed with Craig Foreman and Christopher Langer that the inflated portions of their invoices—$305,000 [sic] over actual cost on the Foreman Lumber invoice and $105,000 over actual cost on the Langer Electric invoice—represented payment to him for general-contracting work and electrical work he claimed to have personally rendered to those contractors. Both Foreman and Langer testified directly that no such agreements existed and that no such services were rendered. Accordingly, the 2-level enhancement at USSG § 3C1.1 appears to apply.

Revised PSR at 11 (¶ 51). The Court's tentative finding is that it is more likely than not that Luneke perjured himself when he testified under oath that he had agreements with both Langer and Foreman that the contractors would pay Luneke for his work on the car wash. Langer and Foreman owned separate companies that constructed different parts of the car wash yet both witnesses testified that they did not agree to pay Luneke for his work. The Court finds the congruent testimony of these two different witnesses more credible than Luneke's testimony to the contrary, and the Court concludes that the consistency of the contractors' testimony leaves "no doubt that the defendant's false testimony at trial was not the result of confusion, mistake, or faulty memory." *Reed*, 978 F.3d at 544 (internal quotation marks and citation omitted). Furthermore, Luneke's testimony that he had agreements with the contractors was unequivocal, willful, and related to a material matter—the nature and purpose of the inflated invoices used to obtain more favorable loans. The Court therefore tentatively overrules Luneke's objection to the obstruction of justice enhancement.[4]

---

[4] At this time, the Court limits its tentative finding to Luneke's testimony about the existence of agreements with Foreman and Langer, and the Court presently expresses no opinion on the veracity of Luneke's remaining testimony.

### D. The Government's Remaining Objections

The Court turns to the Government's two remaining objections, both of which contest the Revised PSR's non-application of additional enhancements.

### 5. *The "Substantial Financial Hardship" Enhancement*

The Government objects to the non-application of a two-level sentencing enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii), which provides for such an increase if the offense "resulted in substantial financial hardship to one or more victims." The Guidelines set forth a non-exhaustive list of factors for courts to consider "[i]n determining whether the offense resulted in substantial financial hardship to a victim." U.S.S.G. § 2B1.1 comment. n.4(F). To make this determination, courts ask whether the offense resulted in the victim:

(i)     becoming insolvent;

(ii)    filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);

(iii)   suffering substantial loss of a retirement, education, or other savings or investment fund;

(iv)    making substantial changes to his or her employment, such as postponing his or her retirement plans;

(v)     making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and

(vi)    suffering substantial harm to his or her ability to obtain credit.

U.S.S.G. § 2B1.1 comment. n.4(F).

Although there is no evidence that Fichter became insolvent, filed for bankruptcy, suffered substantial loss of a fund or his savings, or made substantial changes to his employment or his living arrangements, the evidence at trial does prove by the preponderance standard that Fichter "suffer[ed] substantial harm to his . . . ability to obtain credit." U.S.S.G. § 2B1.1 comment. n.4(F)(vi). As the

Government asserts, Fichter testified that he was "forced to pledge additional personal collaterals to refinance with NBC." Filing 141 at 8. The Court concludes that this is the type of substantial financial hardship contemplated by the Guidelines. The Court's conclusion is strengthened by two facts that fall outside U.S.S.G. § 2B1.1(b)(2)'s non-exhaustive list: (1) Fichter's businesses' monthly obligation to Bank of the Valley increased substantially when Bank of the Valley set a 16% default interest rate for Living Waters' loan, and (2) Fichter "was forced to restructure his own financial holdings to preserve the going-concern value of the businesses." Filing 141 at 8. The Court finds that these facts are similarly serious to those in the guideline commentary to suggest that it is more likely than not that Fichter experienced substantial financial hardship as a result of Luneke's offense. Accordingly, the Court tentatively sustains the Government's objection to the non-application of the substantial financial hardship enhancement.

6. *The "Gross Receipts" Enhancement*

The Government also objects to the non-application of a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(17)(A). Filing 141 at 2. That Guideline provides for a two-level increase if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(b)(17)(A). As defined in the commentary, "'Gross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." U.S.S.G. § 2B1.1 comment. n.13(B) (emphasis omitted). "For the purposes of subsection (b)(17)(A), the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000." U.S.S.G. § 2B1.1 comment. n.13(A).

The Court determines at the outset that the loans issued to Living Waters by Bank of the Valley—loans clearly exceeding $1,000,000—constitute "property" derived from a financial institution. U.S.S.G. § 2B1.1 comment. n.13(B); The question for the Court is whether Luneke individually derived that property as a result of his offense. *See* U.S.S.G. § 2B1.1 comment. n.13(A) (explaining that for the two-level enhancement under U.S.S.G. § 2B1.1(b)(17)(A) to apply, "the gross receipts to the defendant individually, rather than to all participants, [must] exceed[ ] $1,000,000"). In a case dealing with a similar guideline that is no longer in effect,[5] the Eighth Circuit concluded that the defendant properly received an enhancement for deriving more than $1,000,000 in gross receipts even though the funds went to a company and "not to [the defendant] personally" because the defendant was "the sole owner and president of" the company. *United States v. Stolee, 172 F.3d 630, 631 (8th Cir. 1999)* (per curiam). The *Stolee* court explained that due to the defendant's position in the company, the defendant himself "arranged for the funds to be deposited in an account he controlled, and he directed how the funds were used." *Id.* As a result, the *Stolee* defendant "indirectly benefited from the illegally derived funds." *Id.* Furthermore, the company was not a "separate participant in [the] offense, but only the legal entity through which [the defendant] committed the offense," meaning the defendant still derived the gross receipts "individually." *Id.*

Unlike in *Stolee*, Luneke is not the sole owner of Living Waters nor is he the majority owner. However, the Government contends that Luneke's 40% stake in Living Waters does not preclude the application of the gross receipts enhancement because Luneke "individually directed the use of th[e] proceeds" loaned to Living Waters. Filing 141 at 9. The Government asserts that Luneke used the loan proceeds to (1) "pay the inflated portions of the contractor invoices, which then flowed

---

[5] USSG 2F1.1(b)(6)(B).

back to him as kickbacks"; (2) "extinguish the maturing $2,475,000 [Bank of the Valley] note that he could not otherwise have refinanced on truthful inputs;" (3) "pay down personal and company debts he concealed from the Bank"; and (4) "finance his lifestyle." Filing 141 at 9–10. The Government does not cite any case law supporting its claim that Luneke individually derived Living Waters's loan proceeds by directing their use, but the Court tentatively concludes that this claim is consistent with principles of *Stolee* and therefore a two-level gross receipts enhancement should be imposed.

Even though Luneke was not the sole owner of Living Waters, the evidence at trial demonstrated that he exercised significant managerial control over the company, which served as "the legal entity through which [he] committed the offense." *Stolee*, 172 F.3d at 631. Among other things, Luneke spearheaded the efforts to obtain funding, he paid the contractors who worked on the car wash using Living Waters' bank account, and he paid himself from Living Waters' bank account. In short, Luneke "arranged for the [loan] funds to be deposited into an account he controlled, and he directed how the funds were used." *Stolee*, 172 F.3d at 631. Although many of the funds under Luneke's direction and control were used for business purposes, those purposes were undeniably for Luneke's benefit as a member of the businesses. The Court does not believe that Fichter's ownership changes the fact that Luneke individually controlled and made use of Living Waters' funds. *See United States v. Owen*, No. 24-5828, 2026 WL 1349327, at *14 (6th Cir. May 14, 2026) (rejecting the defendant's attempt to "sidestep" the gross receipts enhancement because the funds at issue were disbursed to companies that the defendant and his wife owned and concluding that "[a] defendant who controls and makes use of an entity's ill-gotten funds has 'obtain[ed]' those funds no less than if the funds went into his individual account"). Accordingly,

the Court tentatively sustains the Government's objection and determines that the two-level enhancement under U.S.S.G. § 2B1.1(b)(17)(A) should be imposed.

### E.  Luneke's Objection to the Non-Application of the Zero-Point Offender Adjustment

The Court concludes with Luneke's objection to the non-application of the zero-point offender adjustment pursuant to U.S.S.G. § 4C1.1. *See* Revised PSR at 11 (¶ 48), 13 (¶ 63). There are eleven requirements a defendant must meet to be eligible for the zero-point offender adjustment under the Guidelines, two of which are relevant here:

\* \* \*

(6) the defendant did not personally cause substantial financial hardship;

\* \* \*

(10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role)[.]

U.S.S.G. § 4C1.1(a)(6), (10). There is no dispute that Luneke satisfies the other nine requirements. The Revised PSR did not adjust Luneke's offense level under U.S.S.G. § 4C1.1 because it imposed an aggravating role adjustment. Revised PSR at 11 (¶ 48) ("Per USSG § 4C1.1(a)(10) precludes a two-point reduction for zero-point offender if the defendant received an adjustment under USSG § 3B1.1(c)."). As discussed in Section III.C.3. above, the Court's tentative finding is that the Revised PSR properly applied the aggravating role enhancement to Luneke, meaning he remains ineligible for the zero-point offender adjustment. The Court's tentative finding that Luneke is subject to an enhancement for causing substantial financial hardship also precludes the zero-point offender adjustment. The Court therefore further tentatively overrules Luneke's objection to the non-application of the zero-point offender adjustment.

23

## IV. CONCLUSION

The parties will have the opportunity to make further arguments at Luneke's sentencing hearing, and the Court will rule on the parties' objections and Luneke's Motion for Downward Variance at that time. The Court's tentative findings set forth in this order should guide the parties' arguments at sentencing.

Dated this 10th day of July, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge